THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KIRK WATSON, Defendant-Appellant.

First District (2nd Division)   No. 87—932

Opinion filed January 17, 1989.

William A. Swano & Associates, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Patricia Y. Brown, and James M. Sullivan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Defendant Kirk Watson was sentenced to a term of eight years in the custody of the Illinois Department of Corrections after a jury found him guilty of aggravated criminal sexual assault and criminal sexual assault. Defendant now appeals from his conviction.

After defendant was arrested for sexually abusing his stepdaughter, Alicia Watson, the grand jury returned an indictment charging

him with one count of aggravated criminal sexual assault, three counts of criminal sexual assault, and one count of sexual relations with families.

Prior to trial, the court held a hearing on defendant's motion to suppress his confession, at which hearing he testified on his own behalf and Assistant State's Attorney William Benson testified for the People. In rebuttal, defendant presented the testimony of his wife, Frances Watson.

Defendant's testimony was that the police called him to the police station with reference to his stepdaughter Alicia, that he was told that they wanted to hear his side of the story, and that he did not need to be accompanied by an attorney. Defendant understood that no charges were pending against him and that he would be allowed to go home after questioning.

After arriving at the police station and before there was any questioning by the police, Officer Pancer of the Chicago police department gave defendant his *Miranda* warnings, and defendant responded that he understood those rights. The officer then told him to wait for the arrival of Assistant State's Attorney William Benson.

Defendant alleged that when Benson arrived, he told him that he "didn't want any bullshit out of me, he just wanted a confession." Defendant stated that Benson told him that he had proof that the defendant had molested his stepdaughter, and that if he did not confess immediately, he would go to jail for 20 years. He went on to testify that he told Benson that "[m]aybe I should have a lawyer," but that Benson responded that he did not have time to obtain an attorney.

Defendant further alleged that he made two requests for an attorney during the questioning but that these requests were denied. He also contended that Benson told him that the State had "proof positive" that he was guilty and that there was not a lawyer in the world who would take his case. Benson is also said to have told defendant that his "best bet" was to confess and plead guilty, and promised him a sentence of six months' probation if he did so.

Defendant maintained that the confession, as transcribed by Benson, was not in his own words and that Benson threatened him with a 20-year sentence every time he objected to something in the statement. Defendant further stated that he signed the confession because he wanted his family to be together more than he cared about having a black mark on his record and because he believed he would be sent to jail for 20 years if he did not sign.

On cross-examination, defendant admitted that he understood his

*Miranda* warnings. When asked if Benson informed him of the specific contents of the statement, defendant admitted that Benson told him everything that was included in the statement. Defendant admitted that he did not read the statement in full, but that he did "scan" the statement and sign it.

Benson testified that on March 21, 1986, he was assigned to the felony review unit of the State's Attorney's office and that on that day, he was sent to Chicago's Area 2 Violent Crimes Headquarters to interview defendant. Before interviewing him, Benson advised defendant of his *Miranda* warnings, and defendant acknowledged that he understood his rights. Benson further testified that he first had a conversation with defendant and later a second one with respect to which he transcribed defendant's answers into handwritten form. Benson stated that he never mentioned probation and never made any suggestion that defendant could receive 20 years in the penitentiary. Benson further testified that defendant never asked to speak to a lawyer.

Defendant's wife, Frances Watson, testified that while at the police station with her husband, Benson cursed her and told her to tell her husband to sign the statement or he would go to jail for 20 years. Mrs. Watson also stated that her husband requested an attorney while he was being questioned.

The court found that the testimony of the defendant was not credible, that he was advised of his rights, that he voluntarily relinquished those rights and that he made the statement freely and voluntarily. The court thereupon denied defendant's motion to suppress.

At trial, the People presented the testimony of six witnesses: Alicia Watson, Officer Robert McClain, Sergeant Maryann West, Detective James Pancer of the Chicago police department, Dr. Susan Phillips of Rush-Presbyterian-St. Luke's Medical Center and Assistant State's Attorney William Benson. The testimony of these witnesses established that the following occurred.

At the time of trial, Alicia Watson was seven years old and lived with her grandmother and other relatives. Throughout the summer prior to trial, she lived with her mother, stepfather and older brother. She told the court that something "bad" happened to her over that summer when she was sleeping in her bedroom. After Alicia was given two anatomically correct, dressed dolls, she identified them appropriately as a "man doll" and a "lady doll." Using these dolls, Alicia was asked to demonstrate what had happened to her. Alicia placed the dolls together, stomach to stomach, indicating that the male doll's pants had been loosened and lowered, and that the female

doll was above the male doll.

When the trial judge asked Alicia who was in the bedroom with her, she responded by telling the court it was her "dad." Alicia then indicated that her dad had put "his thing" and finger between her legs, and that thereafter she told her mother what her father had done to her.

On cross-examination, Alicia testified that her baby-sitter's son, Andre Washington, had also abused her. Alicia stated that Andre had put "his thing" inside her twice. Alicia further testified that she never told her doctors about Andre; she told them only about her father.

Dr. Susan Phillips of Rush-Presbyterian-St. Luke's Medical Center testified that she examined Alicia after obtaining a brief medical history from her mother. In giving that history, the girl's mother told Dr. Phillips that Alicia had been having recurring problems with chronic vaginal discharge. The doctor performed a pelvic examination on Alicia in which she noticed an abnormal redness on Alicia's outer vaginal lips and a whitish discharge coming from her vagina. Dr. Phillips stated that Alicia was uncooperative throughout the examination and was unusually frightened for a child her age. The doctor noted that the victim's hymen was not present. Based on those factors, Dr. Phillips became highly suspicious that Alicia was being sexually abused.

Before adjourning court until the following day, the judge asked defense counsel how many witnesses he would present, and counsel responded that he expected to put on six witnesses. However, the next day, Friday, counsel informed the court that most of defendant's witnesses were doctors with rigid schedules and that many of them would not be available. Counsel then asked the court for a continuance until the following Monday in order to allow the defense to secure its witnesses. The court denied the motion.

The defense also attempted to call Alicia Watson to the stand in order to impeach her. Specifically, counsel wanted to impeach Alicia with letters she wrote to her mother after being removed from her home, letters which apparently contained statements that she loved her stepfather. The court denied this attempt due to defense counsel's failure to lay a foundation for such testimony.

Defendant testified and also presented the testimony of two other witnesses: Dr. Angela Bla Cupeles and Frances Watson. Dr. Cupeles testified that she examined Alicia after Mrs. Watson informed her that Alicia was having vaginal discharge and that Alicia may have been sexually assaulted. In addition, Mrs. Watson told Dr. Cupeles

that the child was afraid of her stepfather and that Alicia told her that her stepfather would lie nude in bed in front of the child. Dr. Cupeles also narrated that Alicia was suffering from a type of vaginal infection which may have been caused by Alicia's wiping herself incorrectly. Dr. Cupeles could not determine from the examination if there was actual abuse because Alicia would not cooperate.

Following the testimony of defendant and Mrs. Watson, defense counsel renewed his motion for a continuance due to the unavailability of his other witnesses, who, counsel stated, had been subpoenaed on that day, i.e., February 6, to appear in court on that same day. The trial court again denied the continuance; however, the State agreed to stipulate to certain testimony which would have been presented by the unavailable witnesses if they had been present to testify in person. Specifically, the defense intended to call a Dr. Smith of Mount Sinai Hospital, which has a program to evaluate allegedly abused children, in which program Alicia participated. The State and the defense stipulated that Alicia Watson was examined by medical personnel at Mount Sinai Hospital in September of 1986, and during those examinations Alicia stated that Andre had touched her 84 times and that her stepfather had touched her 1,000 times.

After closing arguments, the jury found the defendant guilty of aggravated criminal sexual assault and criminal sexual assault, and the court sentenced him to a term of eight years in the custody of the Department of Corrections.

Defendant first claims that he was denied his sixth amendment right to the effective assistance of counsel as evidenced by three alleged specific failures: (1) counsel failed to subpoena medical witnesses who were relevant to the defense; (2) counsel failed, during cross-examination of Alicia Watson, to lay a foundation for her impeachment; and (3) counsel failed to cross-examine Alicia Watson concerning her competency and to request a ruling thereon.

The test for determining that the assistance of counsel has been ineffective has two components: the defendant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that but for counsel's unprofessional error the result of the proceeding would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 687; 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064; *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.) In order to assess an attorney's performance, a reviewing court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct

from counsel's perspective at the time. (*Strickland v. Washington*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) However, the accused has a right to competent, not perfect, representation. (*People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649.) Moreover, actions of counsel which are matters of trial strategy or tactical decisions will not be reviewed. *People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203.

But, contends the defendant, his counsel's failure to subpoena medical witnesses had nothing to do with trial strategy, for in his opening statement, counsel made reference to doctors' testimony and medical reports in which Alicia Watson denied abuse by her stepfather. The attorney also told the jury that he planned to introduce evidence which showed that Alicia had continuing vaginal discharge for more than six months after being taken away from her family. However, these witnesses were not subpoenaed until the very day that they were to testify.

On the other hand, the State argues that the defense was not deficient in attempting to secure the testimony of medical witnesses; instead, it asserts, the witnesses' failure to testify was caused by their lack of availability when needed. The State further maintains that had defense counsel produced the witnesses and the evidence they were to provide, it would not have had any effect on the outcome of the case in light of the overwhelming evidence of the defendant's guilt.

■ Assuming, *arguendo*, that defense counsel's failure to subpoena the medical witnesses fell below an objective standard of reasonableness, the error still does not rise to the level of ineffective assistance of counsel, for, as the State suggests, there is no showing that the result of the trial would have been any different had these witnesses testified. Indeed, the State stipulated to part of what defense counsel wanted to bring in, namely, that Alicia told medical examiners that Andre touched her 84 times and her father touched her 1,000 times. Trial counsel also wished to bring out that Alicia's vaginal discharge continued for six months after she was removed from the defendant's presence. Assuming again, *arguendo*, that this is true, it still does not overcome the clear and unmistakable evidence of abuse adduced in this case. Defendant suggests nothing to show that the continuing discharge was not the result of sexual abuse. Surely, the indicia of abuse here clearly outweigh any inference that Alicia's problem stemmed from anything other than sexual assault when we consider the formidable evidence of chronic vaginal discharge, the redness on the outer lips of her vagina, the absence of her hymen, her testimony and that of her doctor, her fear of genital examinations,

and, to be sure, defendant's signed confession.

The second failure of defendant's trial counsel is alleged to be his failure to lay a foundation during Alicia's cross-examination for the purpose of impeaching her with letters she wrote to her mother after being removed from her home, letters which apparently contained statements that she loved her stepfather as opposed to her testimony to the contrary. Before a prior inconsistent statement may be offered for impeachment purposes, a foundation must be laid while the witness is being cross-examined. (*People v. Powell* (1973), 53 Ill. 2d 465, 292 N.E.2d 409.) However, when trial counsel cross-examined Alicia, he asked only if she wrote letters to her father and mother while she was at her grandmother's home. Alicia responded negatively, and counsel did not propound any follow-up questions.

Defendant contends that his attorney's failure to cross-examine Alicia more extensively cannot be dismissed merely as trial tactics or strategy, adding that a trial attorney's ability to lay a proper foundation to impeach a witness is a fundamental one and that his counsel's failure to do this greatly prejudiced him.

The State responds that defense counsel obviously chose as a trial tactic not to cross-examine Alicia on the contents of the letters, noting the attorney's statement to the court, when he attempted to have her recalled as a witness, that he did not want to disrupt her testimony during cross-examination by tendering the letters to the State, which he admittedly neglected to do pursuant to its earlier request for discovery. They were not proferred to the State until after Alicia was excused by the court as a witness for the prosecution. Defendant's attorney insisted at trial that he was "entitled to have Alicia recalled to the stand pursuant to the new discovery that is now in counsel's possession." The State accordingly contends that trial counsel's actions could not have been deficient since they were the result of a strategy designed to increase the impact of the proposed impeachment of the complaining witness. The State also argues that the defendant has failed to prove that but for his counsel's actions, the result would have been different, urging further that the defendant did not show that Alicia would have been impeached by the introduction of the letters, and that the allegations of deficiency on this issue do not pass the *Strickland* test.

■ The proposed impeachment of Alicia through the instrumentality of the letters, however, is a purely collateral matter, for whether or not Alicia loves the defendant is not an issue in this case. We need not wax metaphysical over the meaning of parental love in the obviously confused mind of a six-year-old girl who has been mo-

lested by her stepfather; it goes without saying that the task is totally useless in assessing the child's credibility or in determining whether abuse has occurred. Consequently, we find that the allegations of trial counsel's professional shortcomings in this matter do not survive being put to the *Strickland* test. The attorney's determination to await a favorable moment before introducing the letters was clearly a matter of trial strategy; accordingly, we fail to perceive any showing that the result of the trial would have been different had he succeeded in any way with the use of Alicia's letters.

The third allegation of the ineffective assistance of counsel is said to be trial counsel's failure to request a ruling concerning Alicia's competency and his omitting to cross-examine Alicia thereon. Defendant stresses that Alicia's competency is a threshold issue in the case, and that defense counsel's failure to examine her on this issue is proof of his ineffectiveness.

The State replies that Alicia showed that she was competent to testify and that the decision not to cross-examine her was another instance of a trial tactic by which defense counsel avoided an unnecessary confrontation with a sensitive witness who might have won the sympathy of the jury thereby. The State cites *People v. Brown* (1980), 91 Ill. App. 3d 163, 414 N.E.2d 249, in which the court faced a similar allegation of ineffective assistance of counsel and in which it held that the defendant was not prejudiced by his counsel's failure to question the competence of an eight-year-old victim of sexual abuse; since the witness was competent to testify, defense counsel was not deficient when he failed to object to her testifying. *Brown*, 91 Ill. App. 3d at 165, 414 N.E.2d at 251.

■ Failure to question Alicia's competence was not ineffective assistance of counsel; she clearly was competent to testify: the defense makes no showing that such questioning would have overcome the fact that Alicia stated that she knew truth from falsity and that she understood what had happened to her. Her testimony is clear and free from any inconsistency. The witness having been found competent, we hold that defense counsel was not deficient in having chosen not to object to her testifying. *Brown*, 91 Ill. App. 3d at 165, 414 N.E.2d at 251.

The defendant further argues that even if these errors do not individually consist of ineffective assistance of counsel, cumulatively they amount to as much. In support of this position, he cites *People v. Bell* (1987), 152 Ill. App. 3d 1007, 505 N.E.2d 365, in which it was held that counsel's errors when considered cumulatively deprived the defendant of a trial with a "reliable" result. The court listed 11 errors

made by defense counsel, including failure to investigate, interview and call seven known witnesses, failure to file a motion to suppress, failure to tender a jury instruction relating to the finding of a lesser included offense, failure to impeach, and failure to object to clearly inadmissible exhibits offered by the State. The defense also attached affidavits of the seven prospective witnesses' testimony to its motion for a new trial.

■ Here, trial counsel's mistakes, if, indeed, they can be so denominated, and if, indeed, they do not equate with trial strategy, cannot be said, whether considered individually or cumulatively, to amount to ineffective assistance of counsel. *Bell* is distinguishable from the case now before us in that Bell's allegations against his attorney truly represented numerous and egregious errors permeating every stage of the proceeding. We have already discussed extensively our reasons for holding that when examined individually, the alleged errors fail to demonstrate that there has been ineffective assistance of counsel on the part of defendant's trial attorney in this case; however they may be aggregated, they still fail to amount to ineffectiveness.

Defendant further claims that the trial judge abused his discretion by denying him a continuance which would have afforded him the opportunity to present medical witnesses who would testify that Alicia had vaginal discharge six months after being isolated from her stepfather, adding that this evidence supports his theory that the discharge was not the result of sexual abuse, but an unrelated, long-standing medical problem.

■ All motions for a continuance are addressed to the discretion of the trial court (Ill. Rev. Stat. 1983, ch. 38, par. 114—4(e)), and its ruling will not be disturbed on review unless the complaining party can show that the court abused that discretion. (*People v. Watson* (1981), 98 Ill. App. 3d 296, 303, 424 N.E.2d 329, 335.) In order to show that the motion for a continuance was improperly denied, the defendant must establish that the refusal to grant additional time has in some way embarrassed the accused in the preparation of his defense and thereby prejudiced him. (*People v. Canaday* (1971), 49 Ill. 2d 416, 427, 275 N.E.2d 356, 362.) The court must also determine whether the defendant acted diligently in his attempts to obtain evidence. *People v. Timms* (1978), 59 Ill. App. 3d 129, 375 N.E.2d 1321.

In support of his position defendant cites *Timms*, a case involving three witnesses who were not subpoenaed, wherein the court held that the denial of a continuance in order to give the defense an opportunity to present two witnesses was an abuse of discretion. The witnesses were members of defendant's family who counsel reasonably

believed would appear on their own, and who were delayed by last-minute events unrelated to the subpoena. The court found no lack of diligence on behalf of counsel and acknowledged the materiality of the two witnesses' testimony since they would have testified directly in corroboration of the defendant's alibi.

■■ The State contends that here the court did not abuse its discretion in denying defendant's request for a continuance and that the court's action did not prejudice the defendant, arguing that the defendant has not provided the court with any indication that the witnesses in question would have testified to anything but collateral aspects of the case. The State further argues that the prospective witnesses would have offered no factual testimony as to sexual abuse of Alicia by the defendant, adding that the controlling factor in denying defendant's motion for a continuance is defendant's failure to show the impact the witnesses would have had on the trial if they had been allowed to testify. Finally, the State contends that the defendant failed to show that he was prejudiced in the presenting of his defense. For the same reasons we have discussed above in connection with defendant's allegations of ineffective assistance of counsel in his failure to subpoena these particular witnesses, we find no abuse of judicial discretion here.

Defendant's last issue is his claim that the trial court erred in failing to suppress his oral and written statements for the reason that the State failed to present all material witnesses thereto. Defendant charges that the State should have called not only Assistant State's Attorney Benson, but Officer Pancer as well, since both were material witnesses to the confession. Instead, the State presented only the testimony of Benson. Defendant asserts that this was insufficient since Officer Pancer was also a material witness, thus making his testimony imperative.

■■ ■ When the voluntary nature of a confession or statement is challenged by a motion to suppress, the State has the burden of proving that the statement was voluntarily given. (*People v. Lopez* (1981), 93 Ill. App. 3d 152, 416 N.E.2d 1127; *People v. Young* (1983), 115 Ill. App. 3d 455, 450 N.E.2d 947.) The State can discharge this burden only by producing all material witnesses connected with the statement or by explaining their absence. (*Lopez*, 93 Ill. App. 3d at 156.) It is for the trial court to determine the voluntariness of a confession based on the totality of the circumstances (*People v. Underwood* (1982), 108 Ill. App. 3d 846, 439 N.E.2d 1080), and a reviewing court will not disturb the trial court's determination as to the voluntariness of the defendant's statement absent a showing that it is contrary to the manifest

weight of the evidence. *People v. Slaughter* (1978), 59 Ill. App. 3d 159, 376 N.E.2d 33.

The State argues that the trial court's ruling was in direct accordance with the facts presented, and further points out that the defendant, in his own testimony, stated that Officer Pancer was not present when Assistant State's Attorney Benson took his confession; thus, the defendant's argument that Pancer was a material witness to the confession is grossly in error, citing *People v. Tyler* (1984), 128 Ill. App. 3d 1080, 471 N.E.2d 968, in support of its position. In *Tyler*, the People argued that certain persons were not material witnesses to the defendant's confession since they were "in and out" when the defendant was making his statement. The court held that it was not necessary to call people who were in and out of the room and did not participate in taking the confession. *Tyler*, 128 Ill. App. 3d at 1091.

Here, the State reasons that since Pancer was not present when the defendant's confession was transcribed or when the defendant read and signed the statement, the only material witnesses were the defendant and Assistant State's Attorney Benson—both of whom testified. The State also indicates that the court found the defendant's testimony was not credible, and that, therefore, based on the totality of the circumstances, the trial court's finding that the defendant's confession was voluntary is not contrary to the manifest weight of the evidence.

■■ We quite agree with the State and find that the court did not err when it declined to suppress the defendant's oral and written statements and held that the State produced all of the material witnesses. In light of *Tyler*, the only material witnesses to the confession were the defendant and Assistant State's Attorney Benson. Officer Pancer was not a material witness to the confession inasmuch as he did not remain in the room throughout the confession and did not participate in taking it.

Accordingly, for all the reasons stated above, the trial court is affirmed on all counts.

Affirmed.

EGAN, P.J., and BILANDIC, J., concur.