THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MIMS DONALD, Defendant-Appellant.

First District (4th Division)   No. 1—90—0750

Opinion filed December 5, 1991.

Roosevelt Thomas, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:

Defendant, Mims Donald, was convicted of aggravated criminal sexual assault and aggravated criminal sexual abuse and sentenced to 20 years in prison. On appeal, he challenges the sufficiency of the evidence.

BACKGROUND

According to the testimony adduced at trial, the complaining witness (K.D.) was sexually assaulted by Donald, her uncle, in the early morning of October 7, 1988. At the time, K.D. was 12 years and 10 months old. She had gone to her aunt's home to baby-sit four children while her aunt was at work. Because of her aunt's hours, K.D. was to spend the night. She went to bed at about 9:30 or 10 p.m.

K.D. testified that at approximately 1 a.m., Donald awakened her and said to come with him to the basement as he had something to show her. When they got there, he started taking off her pajamas, a one-piece garment with feet in them. She was wearing black underwear and a bra underneath, which he did not remove. K.D. testified that her uncle put her on a bed in the basement and lay on top of her. He was in a shirt and underwear. He told K.D. he had to put something in her so she would not get pregnant and she said she felt him do so. She also testified that he pulled her panties to one side and put his penis in her vagina. She was screaming and struggling. She testified that he then got up off of her because she was screaming so loud, and he apologized to her. He said his wife, her aunt, was pregnant and he could not handle any more responsibility.

K.D. went upstairs and Donald came to her room to apologize again. She remained awake the whole night, crying and scared. The next morning, however, she did not tell her aunt. She did say she wanted to go home early.

Donald then told his wife that he knew why K.D. wanted to go home and he told her what he had done. His wife became upset and comforted K.D., while Donald said he would be willing to go to jail. His wife said they would have to tell K.D.'s mother first and the three of them drove to K.D.'s house to do so.

On cross-examination, K.D. admitted that she had spent much time at Donald's house without incident. She said she had had a very good relationship with him up to that point. She agreed that he ap-

peared to have been drinking the night of the attack. She also admitted telling the police that he had his penis inside her for 5 or 10 minutes. She said she knew it was his penis because she put her hand down when she was pushing him away and could feel it through an opening in his underwear.

K.D. was taken to the hospital for a complete examination. The results of the examination were not presented at trial, however, and are not of record.

The victim's mother testified that she is Donald's sister-in-law. She met with him and her sister on October 7, 1988. K.D.'s mother said that when she got into her sister's car, Donald told her that he had raped her daughter. He said he was sorry, that he would give her money or do whatever he could to help K.D., even if it meant going to jail. He also said he was drunk at the time of the incident.

The State called Donald's wife to the stand. She and Donald were separated at the time of trial. She testified that when she had returned home from work on October 7, 1988, her niece told her she wanted to go home. Donald was in bed, but as they were leaving, he came out and asked where they were going. She told him and he said he knew why K.D. wanted to leave. The three of them discussed what had happened.

She testified that K.D. started to cry then and said Donald had fallen on her. Donald said he had put some "stuff" in her, a spermicide. The witness said that her husband had purchased the spermicide a few days before, even though she was pregnant. She said they talked about it and Donald said maybe it was not too late. She testified that her husband was the one who purchased contraceptives in their family and he even opened one to use after she told him she was pregnant. She testified that Donald never told her he had raped K.D. He only said he had put the spermicide in her.

Ken Lietz, a police detective, testified that when he arrived at the Donalds' home to investigate the sexual assault he searched the basement. He saw a bed with laundry on top and a foil wrapper from a spermicide capsule. He showed it to Mrs. Donald, who identified it as similar to the spermicide her husband had brought home.

Donald turned himself in to the police after the incident and told Lietz that he had worked until 12:30 a.m. and gone drinking afterwards with friends, arriving home at around 3 or 4 a.m. He woke up K.D. and told her to go to the basement. Lietz said that Donald confessed that he told K.D. to remove her pajamas and lie down on the bed. He admitted inserting the spermicide but said that it dawned on him what he was doing and so he got up, slipped, and fell on top of

K.D. Then he rolled off onto the floor. They talked for about 10 minutes and both went to bed. The next day, he told his wife what had happened.

Detective Lietz also testified that K.D. first told him that Donald had placed a condom in her but later said that it was a capsule, after Lietz found the wrapper in the basement. She also claimed that Donald's penis was in her for 5 to 10 minutes. Donald told Lietz that he had been drunk on the night of the incident but had never put his penis inside of her..

After the State rested, Mims Donald, 40 years old, testified on his own behalf. He said he had worked until 12:30 the morning of the incident and gone with friends to drink for several hours, sharing with them two pints and a fifth of liquor. He said when he got home he was "pretty well lit up." He pulled off some of his clothes. He helped one of his daughters get up to go to the bathroom and put her back in bed. Then he went in his room and got a contraceptive device. He went back to the kids' room and told K.D. to come with him to the basement.

She sat on the bed in the basement and he asked her to pull off her pajamas. She asked him not to hurt her and said how disappointed she was in him, and then started to cry and scream. He testified that he fell on her as he got up to leave and they talked for awhile. Donald said that he did not place any capsule inside her or put his hands on her. He said he did have it in mind to have sex with her but changed his mind when he came to his senses. He also denied telling anyone, including K.D.'s mother, that he had raped K.D. or put anything in her vagina.

He was convicted of aggravated criminal sexual assault, criminal sexual assault, aggravated criminal sexual abuse, and unlawful restraint.

In the sentencing hearing the sole factor in aggravation, apart from the facts of the offense itself, was a 1978 auto theft conviction for which he had received one year of probation. The record, if not the briefs, indicates that a substantial amount of evidence in mitigation was presented, including psychological opinion testimony and letters from friends, family, and co-workers at Borg-Warner, where he had worked. An organization called the Midwest Center on Institutions and Alternatives prepared a "Client Specific Plan" which analyzed his personal and family background, education and employment, marriage and children, substance abuse history and psychological profile. The report traces Donald's long history of employment, often at several jobs to provide for his family. The diagnostic tests used for

evaluating his psychological make-up, including the Minnesota Multiphasic Personality Inventory, were described in the report. The conclusion of the personnel who administered and evaluated the tests was "that Mr. Donald does not fit the profile of a pedophile."

Donald's wife testified at the sentencing hearing and said that in the many years that she had known him and had nieces or other young children around the house she had seen no activity of any sexual improprieties or advances on the part of her husband.

Another defense witness was a minister, who testified that Donald worked with the church's program to feed the hungry. He said he considered Donald to be a productive member of society. The court asked the minister a series of questions about the young victim, whom the witness did not know, at one point asking what the minister thought about specific prison terms as "help[ing] her forget" the crime.

The defense attorney represented to the court that Borg-Warner had agreed to put Donald on leave of absence instead of firing him if he were to receive a minimum period of incarceration.

A couple of specialists who had either treated or tested Donald also testified. One explained why, in her opinion, Donald did not fit the profile of a "fixated pedophile or child molester" and that his expression of remorse, stress aggravated by alcohol, and other factors indicated that a minimum sentence would be appropriate. The witness also stated that Donald had made substantial efforts to cooperate with his counselling and had been attending Alcoholics Anonymous meetings.

Again, the trial court questioned the witnesses who had evaluated Donald, asking whether they had interviewed the victim.

The record also reveals that on two or three different occasions during the hearing, the court commented that the potential sentence in the case, for the Class X offense, was 60 years (which would be the maximum, *extended* term).

When Donald was given the chance to address the court before imposition of sentence, the court also asked him about the victim. Finally, the court remarked, after hearing the defense plea for lenience in sentencing:

> "Okay. Now, I grieve for him, for the fact that his children, maybe his house is in foreclosure and everything else, but you know, we have to look at something, to me more important than all of that stuff. I have got a victim and I haven't heard one person in this courtroom aside from me, I keep asking questions about the victim, no one else asked a question about the victim. Here is a woman who was raped, thirteen years old.

Forget woman. She is a baby. Thirteen year old baby. They are not women. Okay. So we are going to condone every drunk who sits here and comes around and says okay, here's how I beat it? He wasn't that drunk that he didn't know to not get her pregnant. He puts a spermicidal capsule in her vagina, and that there—and now we are supposed to sit here and everyone is supposed to feel sorry for him and I do feel sorry for him because he has problems. The most that means is he is not going to get sixty years, and he probably won't get thirty years, but the minimum is six. There is no way he is going to get a minimum of six either because I am going to sentence him and he is going to have to pay the penalty, and there were all fine people here and believe me I listened to everyone of them and I took it into account but in the back of my mind, I have to take into account a thirteen year old girl has had her life ruined by her uncle. You heard her testimony, [defense lawyer's name]. 'Uncle, I never thought you would do this to me.' That's the testimony. That's how much she loved this man. Isn't that right?

MR. DONALD: Your Honor—

THE COURT: That's how much she loved you.

MR. DONALD: True.

THE COURT: For that you must be penalized because you took advantage of a person who loved you, and for that, you get twenty years in the penitentiary [for aggravated criminal assault]. *** On the [criminal sexual assault] Class I, you get the maximum fifteen years Illinois Department of Corrections. On the abuse, Class II, you get seven years Illinois Department of corrections. On the unlawful restraint, three years ***. All concurrent."

OPINION

On appeal, Donald challenges his convictions of aggravated criminal sexual assault and aggravated criminal sexual abuse as not being proved beyond a reasonable doubt. He has not challenged the propriety of the sentencing, however.

The relevant portion of the aggravated criminal sexual assault statute provides that the offense is established if the accused was 17 years old or over "and commits an act of sexual penetration with a victim who was under 13 years of age when the act was committed." (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(b)(1).) The aggravated criminal sexual abuse statute contains the same age restrictions but defines the abuse as "an act of sexual conduct," which includes a knowing

touching or fondling for the purpose of sexual gratification. Ill. Rev. Stat. 1987, ch. 38, par. 12—16(c)(1).

Donald first contends that the State failed to prove all the elements of aggravated criminal sexual assault, specifically the element of penetration. He relies on two cases in which the courts found the proof of penetration insufficient. (*People v. Kelly* (1989), 185 Ill. App. 3d 43, 540 N.E.2d 1125; *People v. Smith* (1987), 152 Ill. App. 3d 589, 504 N.E.2d 850.) In *Kelly*, two victims, a five-year-old girl and her seven-year-old cousin, said that the defendant had "poked" their vaginas. The majority of the court ruled that there was insufficient evidence of actual penetration by the defendant, despite evidence of redness and medical evidence that was consistent with penetration (although not conclusive of it). Accordingly, the court reversed the Class X offense of aggravated criminal sexual assault and the eight-year sentence imposed thereon. The court went on to affirm defendant's convictions for the lesser included offenses of aggravated criminal sexual abuse, however.

In *People v. Smith*, the 43-year-old defendant was convicted of criminal sexual abuse and sentenced to six years in prison. He had been charged with four counts of aggravated criminal sexual assault, one count of criminal sexual assault, and one count of unlawful restraint. The 11-year-old victim had testified that after school defendant picked her up, threw her on a bed, pulled down her pants and underwear, and put his penis into her vagina after putting a pillow over her head. She said he told her to stop screaming or he would kill her. She did not tell her mother until two days later, after the defendant (who lived with her mother) said he had almost raped the girl and was moving out. The trial court found that the evidence was sufficient to convict for the lesser included offense of aggravated criminal sexual abuse, but not the more serious crime.

We do not agree with Donald that the evidence in this case, construed in the light most favorable to the prosecution, falls short of proof beyond a reasonable doubt that he penetrated the victim. The two cases he cites do not support his position. *Kelly* involved very young witnesses who apparently did not actually state that the defendant inserted his finger into their vaginas. Moreover, one judge wrote a partial dissent from that opinion on the ground that the evidence was indeed sufficient to prove actual penetration. In *Smith*, the complaining witness' allegations had been determined unfounded by the Illinois Department of Children and Family Services. That report was unavailable to defendant because it had been destroyed pursuant to statutory requirements that unfounded incidents of abuse be de-

stroyed. The trial court, judging the victim's trial testimony, found the proofs inadequate as to the more serious, penetration offense. Other witnesses' testimony indicated that defendant had "almost" raped the girl. Under those circumstances, the trial court gave the benefit of the doubt to the defendant on the penetration element of the offense.

In the pending case, K.D.'s mother testified that Donald said he had raped her daughter. Donald's wife testified that he admitted to her that he put the spermicide in K.D., although he said nothing about a rape. The police officers found an empty spermicide capsule, and Donald himself admitted taking one down to the basement. Moreover, in his statements to police after the incident he admitted to inserting the spermicide. He never admitted to inserting his penis in K.D., but the statutory requirement of penetration is not limited to penile penetration. While it may have been preferable for the results of K.D.'s medical examination to have been offered at trial and included in the record, its absence is of limited relevance to our standard of appellate review. The trial court judged the credibility and demeanor of the witnesses, and we cannot say the conviction for aggravated criminal sexual assault was not proved beyond a reasonable doubt. See *People v. Schott* (1991), 145 Ill. 2d 188; *People v. Byrd* (1990), 206 Ill. App. 3d 996, 1006, 565 N.E.2d 776.

■ Likewise, the facts support the conviction for aggravated criminal sexual abuse, since other sexual acts besides penetration fulfil this offense. On the other hand, it is not readily apparent that Donald was convicted of sexual assault and abuse based on different acts. The abuse count should have been vacated if it was based on the same act as the greater offense, aggravated criminal sexual assault. (See *People v. Smith* (1987), 152 Ill. App. 3d 589, 504 N.E.2d 850 (aggravated criminal sexual abuse is a lesser included offense of aggravated criminal sexual assault).) The indictment in the record contains multiple counts, a total of 17, including kidnapping counts that were dismissed. Such overkill hardly aids in the analysis; however, the record does contain an order that embodies the four counts upon which conviction and sentence were imposed. The order of sentence and commitment to the Illinois Department of Corrections reflects that the 20-year sentence was imposed for the Class X offense of aggravated criminal sexual assault, section 12—14(b)(1) (penetration; victim under 13). The remaining convictions and sentences are listed as follows: 15 years for the Class 1 felony of criminal sexual assault, section 12—13(a)(1) (also a penetration offense, but instead of an element based on age of victim, the key is force or threat); seven years for the Class 2 felony of aggravated criminal sexual abuse, section 12—

16(c)(1) (act of sexual conduct with person under 13); and three years for the Class 4 felony of unlawful restraint, section 10—3(a).

The act or acts complained of in this case are the penetration by Donald's fingers (to insert the spermicide) and the penetration by his penis. Either would satisfy the most severe offense of aggravated criminal sexual assault, which requires a penetration of a victim under 13 years of age. K.D. was two months short of 13, so the age element is satisfied. We do not believe, however, that the aggravated criminal sexual abuse count can properly be sustained as a separate conviction because it is also based on the age of the victim and the same act of sexual conduct. (See *People v. Smith*, 152 Ill. App. 3d at 594, 504 N.E.2d at 853.) We therefore vacate the aggravated criminal sexual abuse conviction and sentence.

■ In so doing, we would not ordinarily need to remand for resentencing. (*People v. White* (1986), 114 Ill. 2d 61, 499 N.E.2d 467 (remandment not necessary if improper sentencing element cannot be said to have affected sentence).) In this case, however, we believe that the sentencing determination must be vacated for another reason and remanded for a new hearing. The record in this case and the trial court's comments during the sentencing hearing suggest that the court did not actually balance the statutory factors in mitigation and aggravation. Instead, the court stressed the age of the victim, which is the one element of the offense that brought it into the Class X realm. (See *People v. White* (1986), 114 Ill. 2d 61, 499 N.E.2d 467 (age of victim—under 13 years—is an essential element of aggravated battery of a child and therefore the court should not use age of victim as an aggravating factor in sentencing determination).) In *People v. Embry* (1989), 179 Ill. App. 3d 1059, 535 N.E.2d 87, the appellate court vacated a 24-year sentence imposed upon a defendant who had been convicted of aggravated criminal sexual assault because the trial court had considered the elderly victim's age, a substantive element of the Class X offense, as an aggravating factor. In addition, the trial court had improperly speculated that the defendant might have sexually assaulted another elderly victim in a separate burglary incident if she had not observed his attempt to enter her home.

In the case on appeal, the trial court continuously stressed the victim's age and her relationship to Donald, commenting that for "taking advantage of a person who loved [him]," Donald "must be penalized" with a term of 20 years in prison.

We also question whether it was appropriate for the court to challenge defense character witnesses who testified in the mitigation phase of the hearing by repeatedly inquiring about the victim's well-

being. Without in any way minimizing the harm that was done to the young victim in this case, we nevertheless point out that the sentencing factors in mitigation are to focus on the *defendant* and his potential for rehabilitation as well as his background, not the impact on the victim. (See *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541; *People v. Gibbs* (1977), 49 Ill. App. 3d 644, 364 N.E.2d 491.) The State did not offer any victim impact material and no evidence in aggravation was formally introduced.

Aggravated criminal sexual assault, as a Class X crime (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(c)), carries a sentence in the range of 6 to 30 years. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(3).) Other courts have recognized, however, that the upper end of the range may be an abuse of discretion and out of line with those imposed in similar cases. See *People v. Harris* (1989), 187 Ill. App. 3d 832, 844, 543 N.E.2d 859, 865 (appellate court vacated 25-year sentence in aggravated criminal sexual assault case, "cautiously [finding] that the trial court abused its discretion" in sentencing a 39-year-old offender convicted of aggravated criminal sexual assault upon the seven-year-old daughter of his girlfriend).

The court in *Harris* acknowledged that the sentence was within the statutory range and that the trial court had considered factors in aggravation and mitigation. Nevertheless, the court reviewed the mitigating factors, which are somewhat similar to those present in the instant record. Harris was 39, an alcoholic, with only misdemeanor convictions and no prior record of sex crimes. He had only a fourth-grade education because he was employed at an early age to support his family. His employment record indicated he was a dependable individual. He also supported three children and their mother. The *Harris* court found, "Although defendant's acts are heinous, which we in no way condone, we find that the sentence imposed is excessive." (187 Ill. App. 3d at 845, 543 N.E.2d at 866.) The court then reviewed similar cases in which the courts had imposed minimum, six-year sentences for essentially the same act as present in the case before it, penetration of a young child's vagina with defendant's finger. The court further noted that, "even in cases involving more serious criminal acts with children, the sentences imposed have not been as severe as in the instant case." In support, the *Harris* court cited these cases: *People v. Watson* (1989), 178 Ill. App. 3d 796, 533 N.E.2d 1011 (defendant sentenced to eight years following conviction of aggravated criminal sexual assault for inserting his penis and finger into his seven-year-old stepdaughter's vagina); *People v. Daniels* (1987), 164 Ill. App. 3d 1055, 518 N.E.2d 669 (defendant received six years

for, among other things, directing her son to put his penis into her vagina during a pornographic home video); *People v. Fisher* (1988), 169 Ill. App. 3d 785, 523 N.E.2d 368, *appeal denied* (1988), 122 Ill. 2d 583, 530 N.E.2d 254 (defendant received 10 years for licking, smelling, and inserting a knife into the vagina of his 35-month-old niece); *People v. Bayer* (1987), 160 Ill. App. 3d 218, 513 N.E.2d 457, *appeal denied* (1987), 117 Ill. 2d 546, 517 N.E.2d 1088 (defendant received 14 years for, on numerous occasions, placing his penis into the mouth of his nine-year-old stepdaughter to the point of ejaculation and sexually penetrating her vagina with his finger.)

*Harris* emphasized that, under the Illinois Constitution, rehabilitation is a significant objective of sentencing. The court held that a reduced sentence "will allow defendant at least the possibility of being restored to a meaningful, productive life, and at the same time will be adequate retribution for his offenses, provide protection for society, and serve as a deterrent." (*Harris*, 187 Ill. App. 3d at 847, 543 N.E.2d at 868.) But *cf. People v. Helton* (1990), 195 Ill. App. 3d 410, 420, 552 N.E.2d 398 (declining to "reweigh" sentencing factors and implying criticism of *Harris* decision) (affirming 15-year sentence imposed upon defendant who had a criminal history of sexual misconduct with minors and who blamed victims and otherwise lacked rehabilitative potential).

In the pending case, the trial testimony reveals that Donald was immediately remorseful for his conduct toward K.D. and turned himself in. The sentencing material indicates that he has never before been imprisoned for any offense and has a record of probation only. Nothing indicates that he has in the past or would be likely in the future to sexually attack children, and the complaining witness testified that he had never before behaved improperly around her. According to a report prepared for the sentencing hearing, Donald grew up and attended school in rural Mississippi, quitting after the eighth grade to help his sharecropper parents "work the fields." He has been steadily employed since he started working. He had worked at Borg-Warner for many years at the time of his imprisonment, and the record contains praise for his work as well as his character by several of his co-workers and his supervisor. He supports five children and appears to have a good relationship with them. He was facing marital and financial problems at the time of the incident. The psychological testing and recommendations, by no means binding on the trial court, nevertheless indicate that Donald, who apparently is addicted to alcohol and caffeine, should undergo continuing psychological therapy. In fact,

the report had recommended a sentence of periodic imprisonment with continued counselling and continued attendance at AA meetings.

In light of these facts and the trial court's repeated emphasis on the harm to the victim during the defense presentation of factors in mitigation, we conclude that Donald should receive a new sentencing hearing. (See *People v. Bolyard* (1975), 61 Ill. 2d 583, 338 N.E.2d 168 (reversing sentence and remanding because trial court stated that taking indecent liberties with a child was the "most sinful, reprehensible" of all crimes); *People v. Zemke* (1987), 159 Ill. App. 3d 624, 512 N.E.2d 374 (vacating trial court's denial of probation and imposition of maximum penalty following guilty plea of criminal sexual abuse, where the court stated its belief that no crime was worse).) We also believe that the 20-year sentence imposed herein is excessive under the facts of record. Accordingly, we remand this case for a new sentencing hearing.

For the foregoing reasons, we affirm all convictions except that for aggravated criminal sexual abuse, which we vacate, and remand for a new sentencing hearing.

Affirmed in part; vacated in part, and remanded.

JIGANTI, P.J., and JOHNSON, J., concur.