THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHNNIE L. COLSON *et al.*, Defendants-Appellants.

First District (1st Division)   Nos. 1—85—2766, 1—85—2767 cons.

Opinion filed August 14, 1989.

Randolph N. Stone, Public Defender, of Chicago (James N. Perlman, Assistant Public Defender, of counsel), for appellants.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and Gael M. O'Brien, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MANNING delivered the opinion of the court:

Defendants, Johnnie L. Colson and Johnny Brown, were charged by indictment with attempted murder, murder, aggravated battery, armed robbery and armed violence. Brown filed a motion to suppress his statements which was denied after an evidentiary hearing. Following a bench trial both defendants were convicted of murder.[1] The trial court imposed sentences of 30 years' and 25 years' imprisonment, respectively, against Brown and Colson. In this consolidated appeal, Brown asserts that his motion to suppress statements was improperly denied, and based thereon, that he should be granted a new trial. Additionally, both defendants contend that the evidence was insufficient to prove their guilt beyond a reasonable doubt, that their right to due process was denied when the trial court improperly shifted the burden of proof of self-defense to the defendants, and that they were denied effective assistance of counsel.

During the evidentiary hearing on Brown's motion to suppress, both Officers Michael Cronin and Robert Drozd testified. Officer Cronin testified that he advised Brown of his *Miranda* rights before he and Officer Drozd arrested Brown at 11:30 a.m., on May 18, 1984, at 8148 South Drexel in Chicago, and transported him to the police station. Both policemen denied that they threatened Brown or promised him leniency or that Brown stated that he wanted to remain silent.

Brown testified that at 11:30 a.m. on May 18, 1984, he was awakened by Officer Cronin, ordered from his bed, and advised that he was being arrested for murder. He further testified that four police officers were present at the arrest scene and none of them advised him of his *Miranda* rights. Brown testified that he was interrogated for 10 minutes before being permitted to dress, and when he was escorted to the squad car, his head was "bumped" into the roof of the car by one of the police officers. He stated that Officer Drozd then said "it would be easier" if Brown told them where the gun was and that if he did not he would be dragged outside the car to the police station or would be pushed down the "elevator shaft" at 2417 West Adams. He testified that he was driven past 2417 West Adams en route to the police station. Officer Cronin also urged Brown to confess. Shortly before 8 p.m. a detective and an assistant State's Attor-

---

[1]Michael Collins and Kerry Ford were indicted on the same charges and tried with defendants. However, Collins and Ford were acquitted and are not parties to this appeal.

ney questioned Brown, but he refused to make a statement. After a uniformed policeman advised Brown of his *Miranda* rights, he was placed in a six-person lineup. During the lineup, while Brown observed that some conversation took place between a witness and a policeman, he was unable to discern what was being said. The witness and officer were only about five feet away from Brown.

Brown added that at 11 p.m., on May 18, 1984, he denied any knowledge of the shooting or that he had been at 2417 West Adams at the time of the incident. However, the policemen continued to question him and would not permit him to make a telephone call or leave. Detectives Thomas Blomstrand and James Griffin also testified. Detective Blomstrand stated that on the evening of May 16, 1984, he displayed a photograph array, which included Brown's picture, to Reginald Jett, Reuben Ivy and Steven Thomas. Each of them separately identified Brown.

Detective Griffin testified that at 8:55 p.m., on May 18, 1984, he conducted a lineup in which Brown participated, and two witnesses, who separately viewed the lineup, identified Brown. Detective Griffin denied that he spoke with either witness during the lineup. After the lineup, Detective Griffin advised Brown that he had been identified. When Detective Griffin and Assistant State's Attorney Frank Gaughan advised Brown of his *Miranda* rights, he continued to deny any knowledge of the crime.

At the trial, the testimony of Reginald Jett, James Williams, and Reuben Ivy was similar. Each stated that on May 16, 1984, he was a member of the Disciples street gang. At 4 p.m. on that date, Jett, Williams, Ivy, and the victim, Paul Jefferson, a non-gang member, as well as others, were "pitching pennies" and talking outside the apartment building located at 2417 West Adams in the Rockwell Gardens public housing complex. Willie Cason, another Disciple who was nearby, "yelled out." The victim and other Disciples, excluding Cason, then ran into the building. Jett, Williams and Ivy then observed defendants, who were members of the rival Vice Lord street gang, enter the building.

According to Jett, when the defendants entered the building Colson fired a shotgun into the first-floor ceiling, at which time Jett and his companions ran to the seventh-floor porch. The victim, who was carrying a radio, rested on a window sill while other Disciples conversed on the porch. Then when both defendants appeared on the seventh floor, James Williams hollered, "Look out, run, run." Brown then fired a pistol at the Disciples as they fled from the seventh-floor porch. Later, Jett returned to the porch and observed the victim lying

on the floor but his radio was gone. Subsequently, Jett toured the area with policemen in their squad car. He identified Colson, who was brought to the squad car in which Jett was riding. Jett testified that two days later he identified Brown in a five-man lineup as the man who shot at the Disciples on the seventh floor. Jett indicated that he and his companions were unarmed at the time of the incident.

James Williams, a 17-year-old whose background included a conviction for burglary, testified that on May 16, 1984, while on the playground at 2417 West Adams, he and "others" were told by Willie Cason that the Vice Lords were coming. The Disciples ran into the 2417 West Adams building, but he did not see anything in either defendants' hands when they entered the building. However, when Williams reached the ramp on the fifth floor, he observed defendants remove their jackets and saw Colson pull out a shotgun and Brown a handgun. Williams ran up to the seventh floor where the victim and other Disciples had gathered. Williams then heard more gunshots and observed Brown coming up the stairs to the seventh floor with a gun, and Colson with a shotgun. Williams hollered "break," and he ran into a stairwell at which time he observed the victim seated on a window sill. Shortly thereafter, Williams returned to the seventh floor, where he observed the victim lying on the floor and his radio was gone.

Reuben Ivy testified that when he and the other Disciples fled into 2417 West Adams insults were exchanged between the defendants and Disciples. Ivy proceeded to the seventh floor where the victim sat with his radio on a window sill and other Disciples had gathered. Ivy then saw Brown coming up the middle staircase, enter the seventh floor, and put his hand into his pants, at which time the Disciples ran. Ivy heard several gunshots as he fled to the twelfth floor, where he remained for five minutes, and when he returned to the seventh-floor porch, he saw the victim lying on the floor.

Andre Williams, 16 years of age, whose background included convictions for burglary, robbery and theft, testified that at 4:15 p.m., on May 16, 1984, he was near 2417 West Adams. He heard Willie Cason holler that Vice Lords had entered the building. Williams then entered the building and proceeded to the third floor. He then heard gunshots. When Williams arrived on the seventh floor, he observed the prostrate victim but did not see the latter's radio or any weapon. Williams returned to the third floor and observed Brown and two other youths run from 2417 West Adams towards 340 South Western. Williams proceeded behind them and was shot in the leg by an unseen assailant.

Willie Cason testified that he was 18 years old and had been convicted of robbery. At 4 p.m., on May 16, 1984, Cason alerted fellow Disciple gang members that Brown and other Vice Lords were approaching 2417 West Adams. Cason remained outside the building, but the other Disciples entered and were followed by Brown and his companions. Cason then heard gunshots. Ten minutes later, he observed Brown carrying a large grey radio from the building similar to the victim's radio.

Officer Michael Cronin testified that after he questioned several persons about the shooting, he toured the area with Reginald Jett and Willie Cason. The police officer then apprehended Colson after pursuing him and another youth who wore his hair in a "pony tail." Later that night the officer recovered a .22 caliber semi-automatic Baretta pistol which was concealed in a sofa and a sawed-off shotgun in a school duffle bag stored under a bed in a sixth-floor apartment at 340 South Western. The next day the officer arrested Brown in an apartment on the south side. On the day of the homicide, Brown wore his hair in a "pony tail." However, when Brown was arrested, he had no hair on his head.

Dr. Tae An, an assistant medical examiner, testified that on May 17, 1984, he performed an autopsy on the victim. According to the doctor, the cause of death was a gunshot wound to the chest which lacerated the heart and lung, and a wound to the left buttock.

Assistant State's Attorney George Velcich testified that at 12:45 a.m., on May 20, 1984, he advised Brown of his *Miranda* rights, and the latter made the following statement: At 4:15 p.m., on May 16, 1984, the defendants and another Vice Lord, while armed with a .22 caliber pistol, a sawed-off shotgun and either a .38 or .32 caliber pistol, escorted Colson's cousin "Anthony," who was unarmed, to his tenth-floor apartment at 2417 West Adams. Brown further stated that when they entered the building the Disciples, who were gathered nearby, hollered epithets and pointed an object, resembling a gun, through a fence. Colson then discharged the shotgun into the ground floor; and after determining that the elevator was inoperable, Brown pulled out his pistol and proceeded up the stairway with his companions. When Brown was between the sixth and the seventh floor, he heard a Disciple exclaim, "Them whores in the building, man, let them come on up." When Brown arrived on the seventh floor, one Disciple had his hand in his pocket and other Disciples ran toward defendants. Brown then pulled out his pistol and fired it although none of the Disciples shot at him. Defendants left the building and hid their weapons. Brown added that he subsequently shaved his hair to

change his appearance when he heard that the police had found his gun and were looking for him. He also stated that his statement was voluntary, and that the police had not mistreated him, threatened him, or promised him leniency.

The parties then stipulated that if Assistant State's Attorney Joseph Cavanaugh were called to testify he would state that at 2 a.m. on May 17, 1984, he advised Colson of his *Miranda* rights and that Colson made the following statement: At 4:15 p.m., on May 16, 1984, while carrying a loaded sawed-off shotgun, he, together with Brown and "Anthony," who possessed handguns, and another unarmed Vice Lord whom he did not know, proceeded to 2417 West Adams. Upon their arrival, several Disciples ran inside the building. One Disciple stepped outside pretending he had a gun but then returned to the building. Colson followed the Disciples and fired the shotgun. Next the Vice Lords proceeded up the stairs to the seventh floor. Upon their arrival Colson was assigned to "watch everybody's back" so that no one could "sneak up behind them" while Brown and "Anthony" fired shots at the Disciples whom the Vice Lords had been previously chasing. When the offenders left the seventh floor, Colson gave his shotgun to "Anthony," threw his coat down the elevator shaft so that he could not be recognized and fled from the building. Colson conceded that the police had not mistreated or threatened him.

Others testifying included Officer O.C. High, Detective James McKenna and Officer Donald E. Smith. Officer High testified that when he responded to a call of a man shot, he observed the victim lying on the porch of the seventh floor. While Detective McKenna testified that he could not remember the conversation he had with Reuben Ivy, Reginald Jett and James Williams, he acknowledged that the police report he signed stated that Ivy, Jett and Williams indicated that they had observed Michael Collins with a gun on the seventh floor. Officer Smith, chief firearms examiner, testified that the bullet recovered by the medical examiner from the victim's body was fired from a .38 special caliber revolver. The officer also examined a semi-automatic Baretta pistol with a magazine and a .22 caliber long rifle case body with a missing head as evidence that had been recovered from a sixth-floor apartment at 340 South Western during the investigation of the victim's death.

The parties entered into the following stipulation: (1) that Detective Blomstrand would testify that on May 16, 1984, Reuben Ivy stated that he saw Michael Collins with a handgun outside 2417 West Adams, and that Andre Williams stated Kerry Ford shot him with a shotgun; (2) that Detectives Wayne Gehl and James Griffin would tes-

tify that during a lineup conducted at 10:20 p.m., on May 17, 1984, James Williams and Reuben Ivy identified Michael Collins and Kerry Ford, and that Williams stated that Ford shot Andre Williams and that Collins accompanied Paul Jefferson's assailants; (3) that Andre Williams identified Ford and Collins in a lineup at 8:20 p.m., on May 18, 1984, and Williams stated Ford carried a shotgun and that when Williams left an apartment at 2417 West Adams he was confronted by Ford and Brown, and after he heard gunshots, he was chased by several persons; and (4) that Ivy stated that he was on the ground floor at 2417 West Adams when he was approached by five gunmen, one of whom was Michael Collins, and when Ivy was on the seventh floor, Colson arrived followed by other gunmen, and when Ivy yelled a warning, Colson fired his weapon.

■■ ■ First, we must consider Brown's argument that the court improperly denied his motion to suppress statements and that he should be granted a new trial because the statements were obtained as a result of coercion and a material witness to his statement, Detective Peter McManamon, was not called to testify. When the voluntary nature of a statement is brought into issue by a motion to suppress, the State bears the burden of proving that it was voluntary (*People v. Lumpp* (1983), 113 Ill. App. 3d 694, 696, 447 N.E.2d 963; *People v. Armstrong* (1972), 51 Ill. 2d 471, 475-76, 282 N.E.2d 712), and the State must produce all material witnesses connected with the taking of the statements or explain their absence. (*In re Lamb* (1975), 61 Ill. 2d 383, 336 N.E.2d 753.) However, where the defendant fails to allege coercion or other misconduct when the written confession was executed, the State is not required to call all witnesses who were present when the statement was made. (*Lamb*, 61 Ill. 2d at 390.) A finding by the trial court that the statement was voluntary will not be disturbed unless it is contrary to the manifest weight of the evidence. *People v. Andricopulos* (1987), 162 Ill. App. 3d 899, 905, 516 N.E.2d 302.

■ Although Brown failed to raise this issue before the trial court, he now argues that his motion to suppress statements was improperly denied since the statements were coerced and because the State failed to produce Detective McManamon during the evidentiary hearing. Notwithstanding, our review of the record reveals that Brown testified that the alleged coercive tactics occurred when Officers Drozd and Cronin transported him to the police station and not when he executed the written statement in the presence of Detective McManamon. Therefore, Brown's assertion that Detective McManamon was a material witness and should have been produced during the evidentiary hearing is not supported by the evidence since, as

noted, Detective McManamon was not present when the alleged coercive tactics occurred and an individual cannot be a material witness if he is not present when the alleged coercive tactics occurred. (*In re Lamb* (1975), 61 Ill. 2d 383, 390, 336 N.E.2d 753; *People v. Watson* (1989), 178 Ill. App. 3d 796, 808, 533 N.E.2d 1011.) Therefore, under these circumstances, since Detective McManamon was not a material witness, the State was not required to call him as a witness at the suppression hearing or explain his absence. *Lamb*, 61 Ill. 2d at 390.

■■ Further, Brown acknowledged that the enforcement officials used neither coercion nor promises of leniency to induce him to sign the statement. To the contrary, Brown specifically stated that the police had not mistreated him. Therefore, we also conclude that no coercive tactics occurred. Thus, it would be improper to conclude that Detective McManamon was a material witness whom the State was required to call to trial or that the trial court erroneously denied Brown's motion to suppress inculpatory statements made by him.

■■ ■ We must now consider defendants' contention that the evidence was insufficient to support their convictions. Specifically, the defendants assert that the testimony of the prosecution witnesses was absurd and that there was nothing improbable about Brown's statement of self-defense. It is well settled that in a bench trial it is the function of the trial court to determine the credibility of witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. (*People v. Titone* (1986), 115 Ill. 2d 413, 422, 505 N.E.2d 300; *People v. Akis* (1976), 63 Ill. 2d 296, 298, 347 N.E.2d 733.) A court of review will not substitute its judgment for the trier of fact when evidence is merely conflicting. (*People v. Woods* (1980), 81 Ill. 2d 537, 542, 410 N.E.2d 866.) Moreover, minor inconsistencies in the testimony of the witnesses do not of themselves create a reasonable doubt as to the defendants' guilt. *People v. Brisbon* (1985), 106 Ill. 2d 342, 360, 478 N.E.2d 402.

■■ Once the issue of self-defense has been raised, the State has the burden of proving defendant's guilt beyond a reasonable doubt. (*People v. Ranola* (1987), 153 Ill. App. 3d 92, 97, 505 N.E.2d 1191; *People v. Woods* (1980), 81 Ill. 2d 537, 542, 410 N.E.2d 866.) In reaching its determination, the court must decide whether the facts and circumstances would induce a reasonable apprehension of serious bodily harm in light of defendant's perception of the situation when he used force against his aggressor. *People v. Jones* (1988), 176 Ill. App. 3d 460, 464, 531 N.E.2d 88.

■■ As we have heretofore indicated, the evidence established that defendants were the aggressors. Further, they were the only per-

sons who were armed at the time of the shooting. The victim was carrying a radio and resting on a window ledge. There was no serious provocation or threat of imminent death or great bodily harm to defendants from the Disciple gang members who were on the seventh-floor porch. Additionally, had defendants proceeded directly to the tenth floor, which was their purported destination, rather than enter the seventh-floor porch, they would have avoided the confrontation. In view of these facts and the aforestated principles, we believe that there was sufficient evidence for the trial court to conclude beyond a reasonable doubt that defendants committed the offense for which they were convicted.

■■ ■ Defendants also maintain that the trial court violated their right to due process when it shifted the burden of proof of self-defense to defendants by commenting on their failure to call a witness on their behalf. The State argues that the trial court did not shift the burden of proving self-defense to the defendants. We agree. Due process requires the prosecution to prove beyond a reasonable doubt every element of an offense (*People v. Salazar* (1988), 126 Ill. 2d 424, 449, 535 N.E.2d 766; *In re Winship* (1970), 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375, 90 S. Ct. 1068, 1073), and the "absence of self-defense is an element of every aggravated murder charge" (*Moran v. Ohio* (1984), 469 U.S. 948, 955, 83 L. Ed. 2d 285, 290, 105 S. Ct. 350, 355). Therefore, as previously noted, once the issue of self-defense has been raised, the State has the burden of proving the defendants' guilt beyond a reasonable doubt. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 360, 478 N.E.2d 402.) Moreover, when some evidence of self-defense is presented by a defendant, the State must disprove the defense beyond a reasonable doubt. *People v. Estes* (1984), 127 Ill. App. 3d 642, 651, 469 N.E.2d 275.

Our review of the record herein disclosed that the State brought forth evidence which established that although Brown testified that he and his armed companions escorted Colson's cousin "Anthony" to 2417 West Adams to assure the latter's safe passage to his tenth-floor apartment, neither Colson's testimony nor defendants' conduct supports that claim. It should also be noted that Colson testified that he did not know "Anthony's" last name. The evidence presented by the State further revealed that the defendants went to the building of a rival gang armed with pistols and a sawed-off shotgun. They entered the building and discharged the shotgun. The defendants proceeded to follow the Disciples to the seventh floor. However, prior to entering the seventh-floor porch, Brown directed Colson to act as a lookout and protect the Vice Lords from any violence perpetrated by the Dis-

ciples. Defendants then entered the seventh-floor porch where the victim and other Disciples had gathered, and Brown then commenced shooting at the Disciples as the Disciples ran away, although none of the Disciples shot at the defendants. According to defendants' testimony, they never proceeded to their tenth-floor destination where "Anthony" purportedly resided. Instead, Colson gave his shotgun to "Anthony," who then accompanied Brown to another building.

The record does not disclose that the trial court based its decision that defendants did not act in self-defense upon the fact that "Anthony" was not called to testify. Moreover, the trial court did not shift to the defendants the burden of proving any of the elements of the crime for which they were charged. In light of our review of the record, we conclude that the facts herein do not support the defendants' contention that their due process rights were violated. Therefore, defendants' contention is without merit.

■■ ■ Finally, defendants assert that they were denied effective assistance of counsel when counsel claimed defendants had acted in self-defense but failed to raise the issue of voluntary manslaughter in order to reduce the sentence to which defendants could be subjected. The sixth amendment entitles defendants to the effective assistance of counsel at all stages of all criminal prosecutions. (U.S. Const., amend. VI; *Strickland v. Washington* (1984), 466 U.S. 668, 686, 80 L. Ed. 2d 674, 692, 104 S. Ct. 2052, 2067.) Moreover, the defense counsel is required by the sixth amendment to serve as a true advocate of the accused. (*People v. Hattery* (1985), 109 Ill. 2d 449, 461, 488 N.E.2d 513; *United States v. Cronic* (1984), 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039.) A defendant must show that counsel's performance was prejudicial to the defense of his case in order to establish ineffective representation by counsel. (*People v. Barnard* (1984), 104 Ill. 2d 218, 233, 470 N.E.2d 1005; *Strickland v. Washington* (1984), 466 U.S. 668, 696, 80 L. Ed. 2d 674, 699, 104 S. Ct. 2052, 2069.) In deciding whether a defendant has been ineffectively represented, the court must determine whether there is a reasonable probability that but for the occurrence of counsel's errors, the result of the case would have been different. *People v. Enoch* (1988), 122 Ill. 2d 176, 202, 522 N.E.2d 1124; *People v. Albanese* (1984), 104 Ill. 2d 504, 525, 473 N.E.2d 1846.

■■ In the instant case, defendants contend that they were acting in self-defense when the killing occurred; therefore, counsel should have raised the theory of voluntary manslaughter. Whether a killing is justified under the theory of self-defense depends upon the surrounding facts and circumstances and is to be decided by the trier

of fact. (*People v. Woods* (1980), 81 Ill. 2d 537, 542, 410 N.E.2d 866.) Moreover, the decision of the trier of fact regarding the issue of self-defense will not be disturbed on review unless the decision is so unsatisfactory or improbable as to raise a reasonable doubt as to the defendants' guilt. (*People v. Balfour* (1986), 148 Ill. App. 3d 215, 222, 498 N.E.2d 547.) A defendant establishes that he acted in self-defense when he proves that he was not the aggressor, but was confronted with unlawful force, that he reasonably believed the danger of harm was imminent and that the force he used was necessary to defend against that danger. (*People v. Kyles* (1980), 91 Ill. App. 3d 1019, 1021, 415 N.E.2d 499, 501; *People v. Lenzi* (1976), 41 Ill. App. 3d 825, 834, 355 N.E.2d 153.) When an accused raises a self-defense argument he may be convicted of voluntary manslaughter when it is established that he committed first degree murder but at the time of the killing he unreasonably believed that he acted in self-defense or he acted under sudden and intense passion resulting "from serious provocation." Ill. Rev. Stat. 1987, ch. 38, par. 9—2(a)(1).

In the instant matter, it is uncontested that defendants and their fellow Vice Lords were the only individuals who were armed at the time of the shooting. Upon entering its decision, the trial court noted that defendants could have proceeded to the tenth floor without stopping to avoid a confrontation with the Disciples who defendants knew had gathered on the seventh-floor porch. The trial court concluded that defendants were not acting in self-defense but had proceeded to 2417 West Adams to cause "mischief." Thus, the defendants were the aggressor. Further, there does not appear to be sufficient testimony or other evidence in the record to reasonably justify a finding of voluntary manslaughter. There was no indication that the shooting was a reaction to serious provocation or exonerable under the theory of self-defense. Therefore, under the circumstances of this case, the failure of defense counsel to argue the theory of manslaughter did not constitute ineffective assistance of counsel because there was no showing that failure to raise the manslaughter argument was prejudicial to the defense of the case as required by *Strickland*, nor would such an argument have altered the result of the proceedings.

For the reasons stated, the judgment of the Circuit Court of Cook County is affirmed.

Judgment affirmed.

QUINLAN and O'CONNOR, JJ., concur.