THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROGER D. COOK, Defendant-Appellant.

First District (5th Division)   No. 1—91—3515

Opinion filed April 29, 1994.

Michael J. Pelletier and Anna Ahronheim, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Judy L. DeAngelis, and Susan L. Miller, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

Roger Cook was indicted for first-degree murder in connection with the death of Lauren Whitewing (Lauren). Cook was convicted of second-degree murder and sentenced to eight years' imprisonment after a jury trial by the circuit court of Cook County. A timely notice of appeal was filed. Defendant requests that this court reverse and remand for a new trial on the charge of second-degree murder or, in the alternative, reduce the sentence or remand for resentencing.

Defendant makes five arguments: (1) the evidence was insufficient to sustain a conviction where the State failed to prove beyond a reasonable doubt that defendant was not justified in using deadly force; (2) the trial court's instructions to the jury regarding both the State's burden of proof and the use of defendant's prior conviction were improper; (3) defendant was denied effective assistance of counsel; (4) the cumulative effect of trial errors is prejudicial and warrants a new trial; and (5) the trial court imposed an excessive sentence.

At trial defendant made a motion *in limine* to prevent the jury from hearing testimony regarding a prior conviction less than 10 years old. The court denied defendant's motion. Defendant also made a motion to allow evidence of Lauren's prior conviction for manslaughter which the court granted. At trial the parties stipulated that if called to testify the clerk of the Wisconsin State circuit court would testify that on May 14, 1986, Lauren was convicted of manslaughter and sentenced to a period of imprisonment in the Wisconsin prison system.

Burndetta Randolph testified that she and defendant lived together for about eight years and they had one daughter, Misty Cook. Ms. Randolph kept in contact with defendant and knew that he was going out with Lauren. On September 8, 1990, Ms. Randolph received a call at work from defendant at approximately 8:30 a.m.

She testified that defendant told her he needed to talk to her and asked if she could go home. When she told him she was unable to leave, defendant called an hour later and asked again. This time she agreed. Ms. Randolph testified that when she got home defendant was already there. She asked him what was wrong and he told her that he had killed the girl he had been going out with. Ms. Randolph testified that defendant told her he hit Lauren a couple of times, she fell and he thought she hit her head on the bed. He picked her up and laid her on the bed. Ms. Randolph testified that defendant told her when he woke up the next morning Lauren was dead. Ms. Randolph further testified that she agreed to go to the police station with defendant after she got off work so he could turn himself in.

Ms. Randolph testified that while she was with defendant before they went to the police station, he never said that Lauren had a box-cutter or knife with her. According to Ms. Randolph's testimony, defendant did not tell her that he was afraid for his own life when he killed Lauren. Nor did he state that Lauren attacked him. She further testified that "we didn't go into great detail."

On cross-examination, Ms. Randolph testified that when she saw defendant he seemed very depressed but not angry. She also explained that when she spoke to defendant, their 11-year-old daughter, Misty, was at home so she did not want to go into great detail. On redirect, Ms. Randolph testified that she did not notice any cuts or injuries on defendant's hands or face.

Lisa Rodriguez, Ms. Randolph's older daughter, was present when defendant admitted killing Lauren. Lisa Rodriguez testified that defendant told Lisa that he and Lauren got into an argument when she came over to his house in the middle of the night. Lisa's testimony as to defendant's version of the incident was consistent with Ms. Randolph's testimony. However, Lisa's testimony added that defendant told her that, because Lauren was sleeping with other men, defendant told Lauren he did not want to see her anymore. Lisa testified that she did not remember defendant telling her about Lauren coming at him with a boxcutter knife.

On cross-examination, Lisa testified that she spoke to defendant approximately 30 to 45 minutes. Lisa further testified that defendant told her Lauren was drunk when she came to his house. According to Lisa, when they went to the police station, defendant was upset and crying.

Rudolph Rodriguez testified that on September 8, 1990, he was employed at the Leland Apartments located at 1207 West Leland in Chicago, Illinois. At approximately 12:40 p.m., some Chicago police officers arrived at the apartment building and informed him that

there was someone dead in one of the apartments. Rudolph let the officers into room 533, defendant's apartment, where Rudolph saw a female on the bed who was not moving.

Chicago police officer Keith Uginchus, who on September 8, 1990, was assigned to the 23rd district, testified that on that day he and his partner, Tony Juarez, proceeded to 1207 West Leland after receiving an assignment of a possible "DOA." When they were let into apartment 533, they found the victim lying faceup on the bed having sustained multiple bruises on her face, neck and arms. Officer Uginchus testified that there was no evidence of a struggle in the room. Officer Uginchus further testified that he and his partner surveyed the area next to the body and they did not recover a boxcutter on the bed, at the foot of the bed or anywhere in the room.

Officer Ronald Albee testified that on September 8, 1990, he was assigned to the 17th district tactical unit along with his partner, James Juhas. At approximately 12:30 p.m., one of the desk officers informed them that a person, later identified as defendant, wanted to turn himself in because he believed that he killed his girl friend. The officers took defendant to their office where they identified themselves and advised defendant of his constitutional rights. Officer Albee testified that defendant indicated he understood his rights and proceeded to state that he thought he killed his girl friend because he punched her and the next morning he woke up, and she was cold. Defendant further explained that he got into an argument with his girl friend, he punched her after which she fell and hit her head so he put her on the bed. Officer Albee did not recall defendant telling him that Lauren had a boxcutter knife during their argument. Officer Albee spoke with defendant about an hour.

Sergeant Daniel Sterling testified that on September 8, 1990, he was a detective assigned to Area 6 vice and narcotics. On that day, he was assigned to the 17th district in regard to a man who had turned himself in. Sergeant Sterling identified this man in court as defendant. Sergeant Sterling testified that during a conversation he had with defendant, and while Officers Juhas and Albee were present, defendant related the following: defendant lived with Lauren for three months but they broke up four or five days prior to this incident. On September 7, 1990, defendant went to a tavern located in his apartment building, where he ordered a beer. He saw Lauren sitting in the tavern and he went over to her, poured beer on her and told her to "cool off." He did not say why he did this. Defendant left and Lauren followed him and pushed him after which defendant slapped her and told her to leave him alone. Defendant went out drinking later and returned to the lobby of his building at approxi-

mately 1 a.m. when he saw Lauren with another individual. Defendant offered to fix her car for her if she would leave him alone. Defendant went to his apartment. Lauren followed him. Defendant told Sergeant Sterling that he grabbed Lauren by her hair and tried to push her out of the apartment. Sterling testified that defendant said Lauren picked up a boxcutter from a vanity near the door. Defendant grabbed Lauren's right arm and twisted it to get her to drop the boxcutter, but when this failed, he punched her three or four times in the face and she dropped the boxcutter and fell to the floor. Sterling testified that defendant stated that Lauren appeared to be unconscious but he thought this was due to her drinking, so he picked her up and laid her on the bed. Defendant fell asleep in a chair, and when he awoke the next day, Lauren was in the same position in which he put her. He wiped some blood from her mouth and face and off the floor. He then attempted to feel for a pulse and found that her skin was cold. He then realized she was dead. Defendant told Sergeant Sterling that he left the building, went to his former girl friend's home and later turned himself in at the 17th district.

Sergeant Sterling then testified that defendant was being taken to an Area 6 interview room when he noticed dried bloodstains on defendant's gym shoes. When asked if that was in fact blood, and if it was Lauren's, defendant responded that it was and that "Lauren had been bleeding from the mouth."

Sergeant Sterling testified that he contacted the felony review section of the Cook County State's Attorney's office. Assistant State's Attorney Lustig responded and took defendant's statement. According to Sterling's testimony, in this statement defendant added the fact that he punched Lauren two or three times in the chest before he punched her in the face. Defendant's statement was reduced to writing by Assistant State's Attorney Lustig after which defendant read and signed it.

Sergeant Sterling also testified to another conversation with defendant when Assistant State's Attorney Black was present during which time defendant was informed of the finding of strangulation by the medical examiner. In that conversation defendant stated that "the medical examiner must be wrong" and he denied strangling Lauren.

On cross-examination Sergeant Sterling testified that when Assistant State's Attorney Black was present defendant also told them he was afraid of Lauren Whitewing and that he was afraid she was going to cut him with a boxcutter. On cross-examination Sergeant Sterling also testified that every time he talked with defendant, defendant told him how the incident came about and the fact that

there was a boxcutter involved. On redirect Sergeant Sterling testified that despite three conversations with defendant, defendant first mentioned that he was afraid of Lauren in the third conversation with Assistant State's Attorney Black present.

Officer Thomas Reynolds testified that on September 8, 1990, while assigned to the crime lab, he responded to the crime scene at 1207 West Leland, apartment 533. He recovered a boxcutter, located approximately 15 feet from Lauren's body. Officer Reynolds tested the boxcutter for fingerprints but found none. On cross-examination Officer Reynolds explained that the fact that no fingerprints were found does not mean the boxcutter was never touched.

Assistant State's Attorney Lustig then testified that he was assigned to the felony review unit on September 10, 1990, and was called to Area 6 regarding a homicide investigation. Lustig stated that during his conversation with defendant he did not notice any injuries on defendant's person. Nor did defendant mention any injuries he had sustained. Lustig also testified that defendant did not mention that Lauren came at him repeatedly swinging the boxcutter knife. Nor did defendant state that he was afraid of Lauren during the altercation with her.

However, on cross-examination Lustig testified that defendant did mention a boxcutter in his statement. On cross-examination Lustig also testified that, when asked, defendant said he was not afraid of Lauren. Asked why he left that fact out of the statement Lustig testified as follows: "Because I wanted to make it a summary of the facts that had occurred and I didn't want to go into his—well, I wanted to put down what he had said and not—I wanted to put down a summary of the facts that had occurred and as they occurred."

Dr. Mitra Kalelkar, an assistant medical examiner for Cook County, testified at trial to the medical evidence after she was tendered and accepted as an expert in the field of forensic pathology. She testified that she performed an internal and external examination on Lauren. Upon examining the head area, Dr. Kalelkar found a $2\frac{1}{2}$-inch-long laceration on the left side along with numerous bruises and injuries about the face and mouth. There was also a small abrasion on the bridge of Lauren's nose. According to Dr. Kalelkar's testimony, Lauren suffered extensive subconjunctival hemorrhaging, which meant there was some kind of blockage of circulation caused by either compression of the neck or lack of blood flowing into the heart. The result is that the blood vessels of the eye rupture and hemorrhage. The right side of Lauren's face was bruised and swollen and the inner surfaces of her lips were lacerated and contused. Dr. Kalelkar testified that on her neck, Lauren suffered circumstantial

bruising and abrasions indicating some degree of pressure around her neck. In the trunk and body area, Dr. Kalelkar testified that from Lauren's chest to her abdomen, there were faint bruises on the right side, faint bruises on the back of the left shoulder, and numerous bruises about her upper arms and lower extremities. On Lauren's leg area, there were bruises to the right thigh, knee and shins. Dr. Kalelkar testified that by cutting into the bruises, she determined that they were inflicted sometime immediately prior to Lauren's death.

During the internal examination of the head, Dr. Kalelkar discovered extensive hemorrhaging on the under surface of Lauren's scalp which indicated blunt trauma about the head. Dr. Kalelkar testified that Lauren also suffered a fractured hyoid bone which is caused by force being applied to the neck. Lauren's tongue sustained two bites and was contused and lacerated. These injuries, according to Dr. Kalelkar, are the hallmarks of strangulation. They indicate that the deceased was "hungry for air and struggling to get her breath." Dr. Kalelkar testified that, in her opinion, Lauren died as the result of strangulation. She based this opinion on all of the injuries, including bruising in the larynx area. She further testified that it would take about two minutes for someone Lauren's size to be strangled. Dr. Kalelkar testified that at least one if not two hours of hemorrhaging took place prior to the strangulation.

On cross-examination, Dr. Kalelkar testified that tests of Lauren's blood and bile indicated that she was over $1 1/2$ times the legal limit for intoxication. The fact that the level in the bile was almost as high as the blood demonstrated to Dr. Kalelkar that deceased had been drinking alcohol over a long period of time. The doctor acknowledged that the alcohol would have made deceased more belligerent, would have affected her balance and could have suppressed the feeling of pain.

She also testified that the scar on Lauren's neck appeared to be the result of pressure on the neck and, while it was possible it was the result of blunt trauma, it was highly unlikely. Dr. Kalelkar went on to testify that it is highly unlikely for the hyoid bone to fracture as the result of a punch. At the close of the State's evidence, defendant moved for a directed verdict which was denied. After admitting the exhibits into evidence, the State rested.

As his first witness, defendant presented Dr. Michael Kaufman, who was employed in the department of pathology at Evanston Hospital. Dr. Kaufman testified that he reviewed different medical examiners' findings regarding alleged crime victims and damage to hyoid bones. Dr. Kaufman testified that the injuries to Lauren's neck

area were consistent with blunt trauma and that, in his opinion, death was due to cerebral trauma rather than strangulation.

Defendant then presented witnesses who testified that the deceased was violent when she had been drinking, which was often. Defendant testified that he moved to Chicago in 1973 after being discharged from the Marines. He worked on the Tunnels Project for the city for 11 years. When the project drew to completion he began to do construction contracting on his own. In 1990, defendant had a temporary residence in the Leland Hotel. He ran his contracting business out of that hotel, where a lot of the men working with him also lived. He had a van which he parked in front of the Leland. He and his friends used the van as a contracting office.

Defendant's daughter Misty stayed with her dad on weekends. Her mother is State witness Burndetta Randolph. She has an older half-sister, State witness Lisa Rodriguez.

Defendant testified that he met Lauren on June 15, 1990. He testified that the first time he saw Lauren become violent was when he was sitting outside the Leland Hotel in his van talking to the daughter of a friend when Lauren pushed the girl from behind and said "get out of here bitch." Defendant saw Lauren close the blade of a Boy Scout knife and put it in her pocket. Roger asked Lauren what she was doing, and Lauren, who was drunk, asked him: "What are you talking to this bitch for?"

Defendant avoided Lauren for a couple days, but then saw her one day when she was sober. She explained that she was having a lot of problems. Defendant began to see her again. Defendant testified to two other instances when he saw Lauren engage in violence. Defendant and his friend, Harold Hurley, both testified about an incident where they were playing cards in the van with some friends. A man walked up to the van at the same time Lauren approached. Defendant heard the man ask if he could play. Lauren shoved the man back. Harold heard Lauren tell the man to get away from the van. The man pushed her back and the two began to fight. According to Harold, the two "were really going at it," and they both sustained blows. Defendant testified that he broke up the fight. Harold testified that "a couple of people" broke up the fight. Harold did not know whether Lauren had visible injuries but he thought she was struck in the lip.

Defendant and Misty both testified to another violent incident involving Lauren. Defendant and Misty were sitting in the van with a couple other people. Defendant heard screaming and looked across the street where he saw Lauren fighting a woman named Kathy. A crowd had formed around the two women. A third woman joined in

the fight. She jumped on Lauren and pulled her hair. According to Misty, the altercation involved fighting, hair pulling, and scratching. Misty also saw the women bang each others' heads against a car. Defendant and Misty testified that defendant ran over and pulled Lauren away and put her in the van. While defendant went to the driver's side, Lauren jumped out and started fighting with the women again. The crowd converged on the women and Misty was in the middle. Bottles were flying against the van. Police came and told defendant to get Lauren out of there. He threw her in the van. Lauren was hitting defendant and trying to jump out of the van while he drove away. Misty testified that when Lauren was hitting defendant and trying to get out of the van, Lauren was saying that she had to go finish the fight.

On August 30, 1990, about a week before her death, Lauren, according to defendant's testimony, came crying to him that she wanted to see her two children in Wisconsin and needed money to buy flowers for her husband. Lauren was drunk, was wearing the same clothes she had worn for a week, and "smelled like a brewery." Defendant testified that Lauren told him that her husband was dead and she needed the flowers for the cemetery. Defendant, who did not know until that moment that Lauren had a husband, asked about his death. Lauren told defendant she had killed her husband. She explained that she had stabbed him to death because he had been seeing his ex-wife.

Defendant testified that on September 7, 1990, defendant and Harold worked at a gas station. Lauren arrived and saw defendant talking to a young lady who worked there. Lauren commented: "I see why you like working here." Defendant further testified that when he finally told Lauren he wanted nothing to do with her, she responded, "Whenever you go to sleep in that little van of yours, don't sleep too tight." The night of the death, defendant testified that he saw Lauren in the Leland Hotel lounge between 6 and 7 p.m. Defendant testified that as he was leaving, he threw a beer on her and suggested that she "go cool off." According to defendant, Lauren responded, "You can't tell me what to do" and she came at him as though she intended to hit defendant, but the owner of the bar interrupted so defendant ran and got on the elevator.

Defendant testified that later that night he went to a gas station, then to "Carol's Pub," and returned to the Leland Hotel. Defendant testified that Lauren was standing in the lobby and she got on the elevator with defendant. She followed him to his apartment and when defendant attempted to stop her from entering, Lauren slammed the door on his hand. Defendant alleged that Lauren pushed

her way into the apartment. Defendant grabbed her by the hair and pulled her out the door, but not before Lauren grabbed a boxcutter from the bureau. They began struggling and she tried to hit defendant with her other arm. According to defendant, they struggled in the hallway for five minutes when Lauren said, "Okay, if you let me go I'll leave." Defendant let her go, backed up and told her to "get out" to which Lauren responded, "Yes, so you can bring that whore over here," and she allegedly came at defendant with the knife. Defendant started hitting her and they continued to fight. He testified that he banged her against the wall four or five times. He also testified that "[he] might have kicked her." He testified that he hit her in the body and in the face, and that he "beat her up." When defendant realized that she had dropped the knife, he pushed her towards the bed in order to grab the knife. After he grabbed the knife, he turned and looked and she had fallen on the floor. Defendant alleged that he got abrasions on his face during the struggle. Defendant then nudged her and told her to get up, but she did not move. Defendant then went to sit down, because he was "out of wind from the struggle." He tried to wake Lauren up 15 minutes later, but when she did not respond, he put her on the bed assuming that it was because of the alcohol. The next time defendant touched Lauren was at 3 a.m. when he shook her leg to try to wake her up. Defendant denied strangling Lauren. According to defendant, he had an abrasion under his left eye which was bleeding and which he believed was from his fight with Lauren. Also, defendant testified that his hand was swollen from being slammed in the door.

The next morning, defendant noticed blood on Lauren's mouth but she was still the same way he put her the night before. Defendant admitted leaving the apartment and going to his ex-girl friend's house to tell her what happened. Defendant alleged that when he turned himself in at the police station and spoke to Sergeant Sterling, the sergeant noticed defendant's swollen hand and offered to send him to Cook County Hospital. Defendant further alleged that he did not intend to hurt Lauren.

On cross-examination, defendant admitted that he did not call an ambulance for Lauren. He testified that he hid the knife to prevent Lauren from waking up and finding it. The State asked the following compound question: "Did you squeeze the life out of her after you beat her senseless? Did you leave her on that bed where she was bleeding in her brain for over an hour?" Defendant responded: "Yes, sir, I did that." Trial counsel did not object to the State's question.

Defendant rested and moved for a directed verdict which was denied.

In rebuttal, the State presented Sergeant Sterling, who testified that during the course of his conversations with defendant, defendant did not at any time tell him about an injury that he sustained to either of his hands. According to Sergeant Sterling, defendant did not show Sterling his hands and at no time did Sterling tell defendant he would be receiving medical attention for his hands.

After Sergeant Sterling's testimony, the State rested and an instructions conference was held. During this conference, defendant objected to Illinois Pattern Jury Instruction, Criminal 2d, No. 3.13 (2d ed. 1981)(hereinafter cited as IPI Criminal 2d), but the court allowed the instruction. After the jury was instructed, defense counsel realized that she had neglected to tender self-defense instructions, thinking the State was going to tender them. Counsel then tendered IPI Criminal 2d No. 24—25.06. The court gave that instruction, which contains only the definition of justification.

The jury was also instructed, over defense objection, in accordance with IPI Criminal 2d No. 3.13 regarding defendant's prior conviction.

After the jury deliberated, defendant was found guilty of second-degree murder. Prior to sentencing, defendant presented a motion for a new trial which was denied. After the court heard arguments in aggravation and mitigation, considered the presentence investigation report, and allowed defendant to give a statement in allocution, the trial court sentenced defendant to eight years in the Illinois Department of Corrections. Defendant filed a timely notice of appeal on October 17, 1991.

Defendant claims that the evidence was insufficient to sustain a conviction because the State failed to prove beyond a reasonable doubt that defendant did not act in self-defense. When some evidence of self-defense is presented by a defendant the State must disprove the defense beyond a reasonable doubt. (*People v. Graca* (1991), 220 Ill. App. 3d 214, 225, 580 N.E.2d 1328, citing *People v. Colson* (1989), 187 Ill. App. 3d 423, 543 N.E.2d 282.) The State's position is that it satisfied this burden.

The second-degree murder statute reads, in pertinent part:

"(a) A person commits the offense of second degree murder when he commits the offense of first degree murder *** and either of the following mitigating factors are present:

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed *** ; or

(2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing *** but his belief is unreasonable.

(b) Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." 720 ILCS 5/9—2 (West 1992).

The general rule is that a conviction will be sustained where, viewed in the light most favorable to the prosecution, the record evidence is such that a rational trier of fact could have found defendant guilty beyond a reasonable doubt. (*People v. Holmes* (1990), 141 Ill. 2d 204, 565 N.E.2d 950.) Whether an act was justified under the law of self-defense is for the trier of fact and depends on all of the surrounding facts and circumstances. (*Graca*, 220 Ill. App. 3d at 218, citing *People v. Woods* (1980), 81 Ill. 2d 537, 410 N.E.2d 866.) "A decision as to whether a defendant acted in self-defense will not be disturbed on review unless it is so improbable or unsatisfactory that it raises a reasonable doubt of defendant's guilt." *Graca*, 220 Ill. App. 3d at 218, citing *People v. Balfour* (1986), 148 Ill. App. 3d 215, 498 N.E.2d 547.

■ Not only defendant's own testimony but also circumstantial evidence lends some support to defendant's theory that he acted in self-defense. Tests showed that the deceased's blood contained a high level of alcohol. These results enhance the likelihood that the deceased was the initial aggressor in the physical altercation. (Compare *People v. Salazar* (1988), 126 Ill. 2d 424, 535 N.E.2d 766 (where the court found that the blood-alcohol content of a police officer who was fatally shot was not so high that it would have caused the officer, who was a social drinker, to take "a more aggressive stance" in the altercation with the defendant in that case).) In the case at bar, medical testimony indicates that the deceased was over $1^{1}/_{2}$ times the legal limit for intoxication. Defendant testified that he learned from the deceased herself that she had stabbed her husband to death because he had been seeing his ex-wife. The parties stipulated that the deceased had in fact previously been convicted for manslaughter and sentenced to a period of imprisonment. Defendant had also witnessed the deceased as she engaged in recent acts of violence and threats of violence. These included an incident involving a knife. Defendant testified that just a week before her death the deceased told him, "Whenever you go to sleep in that little van of yours, don't sleep too tight." The reasonable person might interpret this statement as a threat to defendant's safety.

On the other hand, the struggle here seems to have been one-sided. A review of the medical and photographic evidence reveals that the injuries to the deceased were both extensive and gruesome. In contrast, defendant was practically unscathed. The apparent one-sided nature of the struggle supports the State's theory that defendant did not act in self-defense.

Where the evidence is merely conflicting, a reviewing court will not substitute its judgment for that of the trier of fact. (*Graca*, 220 Ill. App. 3d 214, 219, citing *People v. Montgomery* (1977), 51 Ill. App. 3d 324, 366 N.E.2d 623.) Accordingly, our review of the record reveals that there was sufficient evidence for the jury to conclude that the force defendant used was not reasonably necessary to prevent the threat of great bodily harm to himself.

Defendant next contests the propriety of the jury instructions regarding both the State's burden of proof and the use of defendant's prior conviction. First, he objects to the trial court's failure to instruct the jury that it was the State's burden to prove beyond a reasonable doubt that defendant was not justified in using the force which he used. Defendant failed to object to the instructions at the time they were given and failed to raise the issue in his post-trial motion. Hence defendant has waived review of this matter. (*People v. Easley* (1992), 148 Ill. 2d 281, 592 N.E.2d 1036.) However, unless we view the evidence of guilt as overwhelming, we may consider the error pursuant to our authority under this court's Rule 451(c). 134 Ill. 2d R. 451(c).

■ The trial court "bears the burden of seeing that the jury is instructed on the elements of the crime charged." (*People v. Parks* (1976), 65 Ill. 2d 132, 137, 357 N.E.2d 487, 489.) In the present case defendant presented some evidence of self-defense. The State had the burden of disproving this defense beyond a reasonable doubt. (*People v. Colson* (1989), 187 Ill. App. 3d 423, 543 N.E.2d 282.) The instructions read to the jury in this case should have indicated that conviction required that the State prove that defendant was not justified in using the force which he used. We cannot say that the evidence is so clear and convincing that the outcome of the trial would not have been different had the jury been properly instructed. The result was grave error in a case that was factually close. See *People v. Berry* (1984), 99 Ill. 2d 499, 507, 460 N.E.2d 742 (where the failure to apprise the jury that the State had the burden of proving, beyond a reasonable doubt, that defendant was not justified in the force he used resulted in grave error and "severely threatened the fundamental fairness of the defendant's trial").

*People v. Wilson* (1992), 230 Ill. App. 3d 651, 595 N.E.2d 165, deserves our attention. There the aggravated battery defendant complained, as does the defendant in the case at bar, of the failure to give IPI Criminal 2d No. 24—25.06A, which instructs the jury that the State has the burden of proving beyond a reasonable doubt that the defendant was not justified in the use of force that he used. Even though the jury was not explicitly so instructed, the court found the instructions were sufficient. In that case, like the case at bar, the

jury was given the definitional instruction on self-defense. However, unlike the case at bar, in addition to that instruction, the offense was defined to the jury as causing bodily harm *"without legal justification"* (emphasis in original) (*Wilson*, 230 Ill. App. 3d at 656). *Wilson* can be further distinguished because there the jury was instructed that, in order to convict, it had to find that defendant acted *"without legal justification"* (emphasis in original) (*Wilson*, 230 Ill. App. 3d at 655). Moreover, the court pointed out that the prosecutor in argument told the jury that the State had to prove that the defendant knowingly, without legal justification, caused great bodily harm to the victim. The court relied on these instructions and arguments to support its conclusion that the jury was adequately instructed that the State had the burden of proving beyond a reasonable doubt that defendant was not justified in the use of force that he used.

The supreme court case of *People v. Huckstead* (1982), 91 Ill. 2d 536, 440 N.E.2d 1248, also sheds light on the present question. The facts are distinguishable. Unlike the case at bar, *Huckstead* was not factually close. Rather, the evidence strongly indicated that the murder defendant did not shoot the victim due to any reasonable belief that it was necessary to prevent the threat of great bodily harm to himself. Several witnesses corroborated that, following an altercation with the victim which occurred in a tavern, Huckstead had repeatedly threatened to shoot the victim while the victim had made conciliatory gestures. A police officer testified that following the altercation Huckstead stated he would go home to obtain a gun. Another witness testified that immediately after the same altercation defendant said "he would get the [victim] before the night's over." (91 Ill. 2d at 539.) A third witness testified that after the altercation the victim told defendant, "Forget it, Huckstead" and "We've been friends for too long." (91 Ill. 2d at 539.) The same witness testified that later when she left the tavern she saw the defendant and he asked her if the victim was still inside. She testified that defendant told her, "I'm going to shoot that [expletive deleted]." 91 Ill. 2d at 539.

While the case was not closely balanced, the issue was the same as in the case at bar: whether the trial court's failure to instruct the jury that the State must prove beyond a reasonable doubt that defendant was not justified in using the force which he used constituted plain error. In concluding that the instructions did not constitute plain error, the court considered not only the instructions, but also the closing arguments by counsel for both sides. In those arguments "defense counsel repeatedly and specifically emphasized that the State had the burden of proving defendant was not justified in the

force he used." (*Huckstead*, 91 Ill. 2d at 545.) In addition the State explicitly acknowledged its burden. The court stated that the instructions and arguments combined "apprised the jury that the State had the burden of proving that defendant was not justified in the force he used."

The case at bar is distinguishable most significantly because it is a factually close one. However, it is also distinguishable because our reading of the closing arguments by counsel for both sides reveals that neither side apprised the jury that the State had the burden of proving that defendant was not justified in the force he used. Defendant's brief notes that "only once during closing arguments was the State's burden to disprove justification mentioned." In closing, defense counsel argued that "the State has not proven beyond a reasonable doubt in this case that Roger Cook intended the death of Lauren Whitewing or that all of the injuries that he caused on her were not in his own self-defense."

We find that failure to set forth the State's burden to prove that "defendant was not justified in using the force which he used" (IPI Criminal No. 25.05 (1968)) in this closely balanced case, where the only evidence against the defendant is circumstantial, constitutes plain error. *People v. Whitney* (1980), 86 Ill. App. 3d 617, 408 N.E.2d 268; *People v. Martinez* (1979), 76 Ill. App. 3d 280, 395 N.E.2d 86; *People v. Pernell* (1979), 72 Ill. App. 3d 664, 391 N.E.2d 85; *People v. Sunquist* (1977), 55 Ill. App. 3d 263, 370 N.E.2d 864; *People v. Wright* (1975), 32 Ill. App. 3d 736, 336 N.E.2d 18.

■ We next consider the propriety of the jury instructions regarding the use of defendant's prior conviction. In the present case at the request of the State the court gave IPI Criminal 2d No. 3.13, which states that "[e]vidence of a defendant's previous conviction of a crime is to be considered by you only insofar as it may affect his credibility as a witness, and must not be considered by you as evidence of his guilt of the crime with which he is charged." The State admits that the giving of this instruction at its request is error. Giving this instruction at the behest of the State may unfairly accentuate defendant's past criminal record. (*People v. Gibson* (1971), 133 Ill. App. 2d 722, 272 N.E.2d 274.) The State hangs its hat on the view with which we disagree that the error is harmless because "the evidence against the defendant is overwhelming."

■ Defendant maintains that he was denied effective assistance of counsel because counsel failed to tender IPI Criminal 2d No. 25.05. Under the facts of this case, there is a reasonable probability that but for counsel's deficient performance the outcome of the proceeding would have been different. Defendant also failed to tender any

instructions as to use of force in defense of dwelling. The cumulative effect of errors by counsel is prejudicial and warrants a new trial in which the trier of fact is entitled to appropriate instructions on the burden of proof as to justifiable use of force and use of force in defense of dwelling. In light of our disposition of this case, we deem it unnecessary to reach defendant's issues regarding sentencing. The State's motion to strike paragraphs 4, 5 and 6 of defendant's motion to expedite consideration was taken with the case and is denied.

For the foregoing reasons, the judgment of the circuit court is reversed and remanded for a new trial. In doing so, however, we note that it is likely that defendant will have served his sentence before our conclusion of this matter and before the appellate process has run its course. Therefore, we regretfully conclude that the relief afforded in our disposition of this appeal is a futile exercise.

Reversed and remanded.

MURRAY, P.J., and GORDON, J., concur.