2021 IL App (1st) 191609-U

No. 1-19-1609

Order filed October 27, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

___

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

___

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 11501 |
| | ) | |
| JOHN WATLEY, | ) | Honorable |
| | ) | William B. Raines, |
| Defendant-Appellant. | ) | Judge, presiding. |

___

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Gordon and Justice McBride concurred in the judgment.

**ORDER**

¶ 1   *Held*:  Defendant's conviction for first-degree murder is reversed where the trial court's failure to comply with Illinois Supreme Court Rule 431(b) when questioning prospective jurors constituted plain error.

¶ 2   Following a jury trial, defendant John Watley was found guilty of first-degree murder and sentenced to 45 years' imprisonment. On appeal, defendant contends his conviction should be reversed because the trial court failed to comply with Illinois Supreme Court Rule 431(b) when questioning prospective jurors and denied him the right to a fair trial by telling prospective jurors

they would have to serve on the jury of a month-long civil trial if they disclosed that they could not be impartial. For the reasons that follow, we reverse defendant's conviction and remand for a new trial.

¶ 3        I. BACKGROUND

¶ 4    A grand jury charged defendant with six counts of first-degree murder. Relevant here, Count I alleged that defendant intentionally shot and killed Anthony Strong without lawful justification on July 5, 2015, while armed with a firearm.

¶ 5        A. Jury Selection

¶ 6    The trial court addressed all prospective jurors together as follows:

"Under the law, the defendant is presumed innocent of the charges against him. The presumption remains with the defendant in every stage of this trial and your deliberations on the verdict. It will not be overcome unless and until the jury is convinced beyond a reasonable doubt that the defendant is guilty. Does anyone disagree with this fundamental principal of the law? If you do, please raise your hand.

May the record reflect no one has raised their hand.

The State has the burden of proving the defendant guilty beyond a reasonable doubt. The State carries this burden throughout this case. Does anyone disagree with this fundamental principle of law? If you do, please raise your hand.

May the record reflect no one has raised their hand.

The defendant's not required to prove his innocence. The defendant need not present any evidence at all and rely on the presumption of innocence. Does anyone disagree with this fundamental principle of law? If you do, please raise your hand.

Let the record reflect no one has raised their hand.

The defendant does not have to testify. Would anyone hold the fact that the defendant did not testify at trial against the defendant? Does everyone understand and accept this principle of law? Please raise your hand if you do not understand or accept it.

Let the record reflect no one has raised their hand.

As jurors, you are the judges of the facts in this case. You alone determine which witnesses to believe and how much weight to give to the testimony of each witness. For example, law enforcement officers may testify in this case as witnesses. Their testimony is to be considered by you just like any other witness. You must not give more or less weight to such testimony simply because of the occupation of such witnesses. Does anyone disagree with this principle of law? Please raise your hand if you do not agree.

Let the record reflect no one has raised their hand."

¶ 7     Defendant did not object to this questioning.

¶ 8     During individual questioning of the venire, the court questioned prospective juror James Bastian as follows:

"[BASTIAN]. I have one neighbor whose son is a Chicago cop.

[THE COURT]. Do you have any conversations with that neighbor's son?

A. Yes.

Q. Do you talk about the facts of his job and what he does?

A. Yes.

Q. The fact that your neighbor's son is a police officer and you know him, would that impact your ability to be fair and impartial in this case?

A. Might be. I'm not sure.

Q. Okay. Do you understand that this gentlemen to my left deserves a fair and impartial trial?

A. Yes.

Q. You don't know him?

A. No.

Q. You don't know the facts of this case, right?

A. No.

Q. Okay. So you're telling me that because it's – the type of charges that are here that you may not be fair and impartial to this man who you don't know who deserves a fair trial?

A. Yes.

Q. You're not willing to listen to the facts of this case and be open minded about it?

A. No, sir.

Q. Have a seat."

¶ 9 Immediately thereafter, the court had the following exchange with prospective juror Anthony Ensalaco:

"[ENSALACO]. I've had my car stolen three times. Once in front of my house where I went after the guys. I've been robbed in the El train when I was maybe in my 30s. And I was robbed one prior time when I was a teenager.

[THE COURT]. The fact that you had those experiences, would that impact your ability to be fair and impartial?

A. Yes, it would, sir. Sorry.

THE COURT. I'm just going to send – everybody who says they can't be fair and impartial, I'm going to send them to the Daley Center so you get stuck on a one-month civil trial. That's insane. You don't know this man. This man deserves a fair trial. This is a fact-based jury. It's got nothing to do with you. It's got nothing to do with your experience in life. This man deserves a fair trial.

Q. You're not willing to do that. Am I correct?

A. I didn't say that, sir. You asked me if it affects me, and it does affect me.

Q. Can you be fair and impartial?

A. By the facts, yes, sir. From experience, no, sir.

Q. Have a seat. I'm just absolutely shocked."

¶ 10    Defendant did not object during the court's questioning of either Bastian or Ensalaco. Both Bastian and Ensalaco were stricken for cause.

¶ 11    B. Trial

¶ 12    1. State's Case

¶ 13    Yolanda Strong testified Anthony Strong was her husband.[1] She and Anthony lived in a house on the 9200 block of South Harper Avenue in Chicago. Defendant, whom Yolanda identified

---

[1] Several of the individuals involved in this case, such as Anthony Strong and Yolanda Strong, and John Watley and Antoine Watley, share the same last names. For clarity, we will refer to these individuals by either their first names or full names.

in court, lived in a house next door. Defendant and Anthony became friends in the early 1990s and spent time together every day. They sometimes argued and shoved each other when they drank, but always calmed down and became friendly again. Yolanda never saw defendant and Anthony become violent with each other prior to this incident.

¶ 14    At approximately 1:00 p.m. on July 5, 2015, Yolanda drove Anthony to their house on the 9200 block of South Harper. When she was sitting on her front porch, she saw Anthony talking to and drinking beer with a group of approximately seven men, including defendant, near defendant's car, which was parked on the street outside his house. Anthony was sober when he arrived, and Yolanda saw him drink one beer next to defendant's car.

¶ 15    At some point, defendant told everyone to get away from his car, but Anthony stood by the car, "tapping" the rear of the car with open hands "like bongos." Yolanda saw defendant go into his house and return with "a big knife" approximately two and a half feet long. Defendant "hit" Anthony with the blade of the knife twice on his left side but did not injure him. Anthony was unarmed. Antoine Watley, defendant's nephew, pulled defendant back and took the knife from him. Defendant went inside his house.

¶ 16    Approximately 10 minutes later, defendant exited his house and sat on his front stoop, facing Anthony. He asked Anthony, "[Y]ou still f*****g with me?" Yolanda saw defendant reach into his left jacket pocket, pull out a silver firearm, point it at Anthony, and fire one time. Anthony fell and Yolanda ran up to him; he was lying on his right side in the street. Anthony "turned over and showed [her] the bullet hole" but was unable to speak. Defendant walked to the sidewalk and Yolanda heard him say, "Let the motherf****r die."

¶ 17    Yolanda called 911 and a female police officer arrived shortly thereafter. The officer exited her police vehicle and asked who shot Anthony; defendant said, "I did it." Paramedics arrived and transported Anthony to the hospital, where he died.

¶ 18    In a photograph, Yolanda identified her and Anthony's house, as well as defendant's house one door to the south. This photograph depicts two single-family homes next door to each other. In front of defendant's front door is a one-step stoop, and his front yard is surrounded by a black fence and a gate with vertical bars. Yolanda also identified defendant's car parked on the street in front of his house. This photograph depicts a maroon sedan parked in front of the gate leading to defendant's front yard, on the side of the street nearest his house, with the front of the car facing north toward Yolanda and Anthony's house. Yolanda indicated that Anthony was standing on the passenger side of the car, between the taillights and the rear wheel, facing across the trunk toward defendant's house, when defendant shot him. She also indicated defendant was on his front stoop when he shot Anthony. The State moved these photographs into evidence.

¶ 19    In another photograph, Yolanda identified defendant's car parked on the side of the street nearest his house, and Anthony's red pickup truck parked on the far side of the street. The front of Anthony's truck is approximately even with the rear of defendant's car. Defendant moved this photograph into evidence.

¶ 20    Antoine Watley testified that defendant, whom he identified in court, is his uncle. Antoine lived with defendant on the 9200 block of South Harper in July 2015. Anthony and Yolanda Strong lived in a house next door to defendant and Antoine's house. Defendant and Anthony had known each other for as long as Antoine could remember and "always had little arguments," particularly

when they drank together, but got along shortly thereafter. Antoine had never seen defendant and Anthony become violent toward each other prior to this incident.

¶ 21    On the afternoon of July 5, 2015, Antoine drank with defendant and Anthony near defendant's car, which was parked on the street in front of their house. Antoine drank two beers and was not intoxicated. Defendant drank "a couple of beers" and "they only had like half a pint of" vodka. Anthony began drinking approximately 30 minutes after he arrived; he drank a "red apple," "Seagram's hundred proof," and beer.

¶ 22    At approximately 2:30 p.m., Anthony and a man named "Chip" got into two arguments in defendant's front yard. When defendant stepped between Anthony and "Chip," Anthony "overpowered" defendant, grabbed his shoulders, and pushed him to the ground. Antoine helped defendant up, defendant and Anthony "had words," and Anthony left the yard.

¶ 23    Later that afternoon, Anthony began "hammering" on the back of defendant's parked car with one closed fist, "telling him to c'mon, c'mon. Let's out here, let's fight." Antoine did not see anything in Anthony's hands. Defendant approached Anthony from his yard holding a two-foot-long machete and tapped Anthony twice on the arm with the flat of the blade. Anthony was not injured. Antoine grabbed the machete from defendant's hand and took defendant inside his house.

¶ 24    Antoine went back outside and saw that Anthony "was mad, but he was just walking around." Defendant then exited his house and sat on his front stoop, and Anthony started beating on the trunk of defendant's car with a closed fist again. Defendant told Anthony to stop hitting his car, but Anthony ignored him. Antoine saw defendant stand up with a firearm in his hand. Defendant cocked the firearm and aimed it at Anthony. Anthony did not have anything in his hands when defendant aimed the firearm at him. Antoine ran toward a back alley and heard one gunshot.

¶ 25    Antoine then ran to his neighbor's house and saw defendant at the front gate of his own yard with the firearm in his hand. Antoine took the firearm out of defendant's hand and removed a bullet and the magazine. He placed the firearm on the front stoop of defendant's house and took the bullet and magazine inside to his bedroom. Antoine returned to the front door of the house and saw police on scene; he heard defendant say, "[Y]eah, I shot him." A female police officer asked Antoine about the magazine, and he gave it to her. Antoine identified defendant's firearm and the magazine in court.

¶ 26    In photographs, Antoine identified his and defendant's house, as well as defendant's maroon Cadillac parked in front of their house, as it was on July 5, 2015. Antoine indicated Anthony was standing at the rear of defendant's car, between the taillights and the rear passenger-side wheel, facing across the trunk of the car toward defendant, who was inside his front gate, when Anthony was "hammering" on the back of the car.

¶ 27    Chicago police detective Shaneice Neighbors testified she was on patrol, in uniform, and driving an unmarked police vehicle at approximately 4:00 p.m. on July 5, 2015, when she responded to a call of a person shot on the 9200 block of South Harper. She arrived within three minutes and saw Anthony lying in the middle of the street, not moving, and his wife, Yolanda, standing next to him. Neighbors asked Yolanda who shot her husband, and she pointed to defendant, whom Neighbors identified in court. Neighbors saw defendant standing on the sidewalk outside his house. She walked toward him; he said, "I did it," and lifted his shirt. Neighbors saw a silver firearm with a black rubber handle in his waistband. She removed the firearm, which had no magazine, from his waistband and handcuffed him. Neighbors identified the firearm she recovered.

¶ 28     Neighbors also identified a photograph of the scene. She indicated Anthony was lying in the middle of the street, next to the rear of defendant's car, when she arrived. Neighbors also indicated defendant was standing on the sidewalk next to the fence when she arrived. The State moved this photograph into evidence.

¶ 29     Officer Christopher Paschal testified he was on duty, in uniform, and driving a marked police vehicle on July 5, 2015. At approximately 4:00 p.m., he and his partner responded to a call of a person shot on the 9200 block of South Harper. When Paschal arrived, he saw a person who had been shot lying in the street, as well as Neighbors interacting with defendant, whom Paschal identified in court. Neighbors had recovered an unloaded firearm, which she handed to Paschal's partner. Paschal and his partner also received a magazine with ammunition in it and a live bullet from the chamber of the firearm. He and his partner inventoried these items. Paschal identified the firearm, magazine, and 10 live bullets in court, and the State moved them into evidence.

¶ 30     Sergeant Jerry Doskocz testified he was on duty as an evidence technician on the evening of July 5, 2015. Dosckoz recovered a fired cartridge case in the front yard of the house to the south of defendant's house, which he inventoried. He also saw a blood stain on the street in front of defendant's house. In a series of photographs, Dosckoz identified where he found the fired cartridge case the front yard of defendant's neighbor's house and the blood stain in the middle of South Harper. He also identified a photograph of defendant's firearm, magazine, and 10 bullets, and confirmed it accurately depicted how those items appeared when he saw them in the back of a police vehicle on July 5, 2015. The State moved these photographs into evidence.

¶ 31     Dr. Ponni Arunkumar testified she was the Chief Medical Examiner at the Cook County Medical Examiner's office. The court qualified her as an expert in forensic pathology.

¶ 32    Dr. Arunkumar performed an autopsy of Anthony Strong on July 6, 2015. She observed one gunshot wound to Anthony's right chest and recovered a bullet from his left back, which she provided to police. The bullet travelled front to back, right to left, and downward. The trajectory of the bullet was consistent with, among other positions, Anthony having been "bent forward with [his] chest down, [his] right shoulder forward, [his] left shoulder back in a sort of lunging forward position." Dr. Arunkumar identified this bullet in court and the State moved it into evidence. There was no evidence that Anthony had been shot at close range and no defensive wounds on his body. Toxicology revealed an alcohol level of 0.225 in Anthony's blood and an alcohol level of 0.352 in the vitreous humor of his eye. Anthony's vitreous alcohol level reflected that his blood alcohol level was at least 0.352 prior to his death, more than four times the legal limit to drive. Dr. Arunkumar determined the manner of death was homicide and the cause of death was a gunshot wound to the chest.

¶ 33    Dr. Arunkumar identified Anthony's body in a photograph, which depicts one gunshot wound slightly to the right of the center of the chest. The State moved this photograph into evidence.

¶ 34    The parties stipulated evidence technician Matthew Savage tested a firearm, magazine, and ammunition inventoried in connection with this case and determined they were negative for latent fingerprint impressions.

¶ 35    Detective Nathan Poole administered a gunshot residue kit to defendant's hands on July 5, 2015, and inventoried it. Illinois State Police forensic scientist Mary Wong tested the gunshot residue kit and found it was negative for gunshot residue particles. She opined that defendant may

not have discharged a firearm with either hand and, if he did, then gunshot residue particles were either not deposited on his hands, removed, or not detected by testing procedures.

¶ 36    Evidence technician Elizabeth Dawson received a fired bullet from the Cook County Medical Examiner's office on July 6, 2015, and inventoried it. Illinois State Police forensic scientist Dianna Pratt received a 9-millimeter Luger semiautomatic pistol, a fired bullet, a fired cartridge case, a magazine, and 10 9-millimeter Luger cartridges inventoried in connection with this case. She determined the bullet and fired cartridge case were fired from that firearm.

¶ 37    2. Defense's Case

¶ 38    Defendant testified he was 62 years old. He was injured in a 1990 car accident that left him with a plate in his right knee and screws and a rod in his pelvis. After that accident, defendant's father bought him a Cadillac, which had sentimental value to him. Defendant met Anthony Strong in 1988 or 1989. In July 2015, defendant lived in a house on the 9200 block of South Harper with his brother and two nephews, including his nephew, Antoine. Anthony occasionally came to check on a house next door but did not live there.

¶ 39    On the morning of July 5, 2015, defendant saw what he believed to be people breaking into his garage, so he went outside with his firearm to investigate. His firearm was loaded with one round in the chamber but did not have its magazine inserted. Defendant saw that nothing was missing from his garage so, at approximately 10:50 a.m., he placed his firearm in the bushes in his front yard because he was going to meet his friend Tony in front of his house. Tony used a wheelchair and died before trial. Defendant met Tony near the back of defendant's Cadillac, which was parked on the street. Defendant then walked, using a cane, half a block to buy half a pint of

alcohol for him and Tony. Defendant returned to his block at approximately 11:15 a.m. and drank the half pint of alcohol with Tony.

¶ 40    At approximately the same time, Anthony Strong arrived and began "bullying and picking on" defendant. Defendant also saw Anthony pull Tony out of his wheelchair near the back of defendant's car at some point that afternoon. Defendant's friend Richard Aldridge, who went by the nickname "Chick," arrived on scene between 1:00 and 1:15 p.m. When defendant was sitting on the driver-side trunk of his Cadillac, Strong hit defendant with a closed fist five times on his left hip, which knocked defendant to the ground. When defendant was on the ground, Anthony hit him twice in the head with a closed fist. Defendant did not know why Anthony was hitting him. He was "in shock," "terrified," and "thought [he] was going to die right there" because his old car accident injuries made it impossible for him to defend himself. Defendant suffered bruises and swelling on his hip and his right eyebrow.

¶ 41    Defendant's nephew Antoine helped him up and took him inside the gate of defendant's front yard. As defendant was trying to close and lock the gate, Anthony ran up and struck defendant on the right side of his jaw so hard that he fell back onto his stoop. Defendant initially testified that Anthony opened the gate before hitting him in the jaw, but later testified that Anthony struck him "straight through" the gate. Defendant "thought [he] was going to die" because Anthony "was acting crazy." Defendant was "in excruciating pain" and was unable to stand up.

¶ 42    Anthony then walked to his own truck on the street and opened the driver-side door. It looked like Anthony was "getting something" out of his truck, but defendant could not see what. Defendant thought that Anthony was "getting a gun" and was "in fear of [his] life." Defendant

knew that Anthony had a firearm and had seen him with a firearm two or three times in the past. He also knew that Anthony had been "locked up for murder" using a firearm in 1989.

¶ 43    Anthony began walking back toward defendant and it "look[ed] like something was in his hands," but defendant could not tell what. Defendant reached into the bushes and grabbed his firearm. Anthony was "a distance" from defendant, "across the street from where his truck was parked." Defendant then shot Anthony because he was "scared for [his] life and believed Anthony "was going to kill [him]." Defendant was not trying to kill Anthony; he was just trying to stop Anthony from attacking him again.

¶ 44    Defendant pulled himself up and "hopp[ed] alongside the wall" to go inside his house, where he called police. Defendant retrieved his firearm's magazine, but his nephew took the magazine from him before defendant spoke to police. When defendant heard police outside, he walked outside "to tell the officer that [he] had shot" Anthony. Defendant's firearm was in his waistband when he told a female officer that he shot Anthony.

¶ 45    In a photograph, defendant indicated he put his firearm in a flowerbed approximately two feet from his front stoop. He also identified himself in two booking photographs.

¶ 46    Richard Aldridge testified defendant, whom he identified in court, was his "old friend" and "drinking buddy." Aldridge's nickname was "Chick." He acknowledged he had been convicted of failure to register as a sex offender in 2017 and 2009. Aldridge went to defendant's house between 10:30 a.m. and 12:00 p.m. on July 5, 2015, and drank with defendant and Tony around defendant's car. Anthony Strong arrived 10 to 15 minutes after Aldridge and "terrorized [them] about like subjects of like [defendant's] car. He [was] messing with Tony in the wheelchair."

¶ 47    Anthony was drinking on July 5, 2015, and got into an argument with Tony and pulled him out of his wheelchair. Anthony then got into an argument with Aldridge in defendant's front yard and shoved him in the chest with both hands. Aldridge acknowledged that he did not mention Anthony pushed him when he spoke to Assistant State's Attorneys about this incident. When Anthony stopped pushing him, Aldridge went around the back of defendant's house, got on the bus, and left. Aldridge believed that defendant and Anthony were arguing when he left defendant's house, but he never saw Anthony push defendant that day.

¶ 48    Yolanda testified Anthony hit her in the face during an argument at 3:00 a.m. on January 2, 1996. She acknowledged she signed a criminal complaint against Anthony attesting he hit her in the head with a telephone and his closed fist. Anthony was arrested but not convicted in that case because Yolanda did not go to court.

¶ 49    Dr. Luke Kopulous was qualified as an expert in radiology. He examined defendant's X rays at Cermak Health Services in March 2016. Dr. Kopulous observed screws in the back of defendant's pelvis and hardware in his left hip and below his right knee, as well as arthritis and bone spurs in his left hip.

¶ 50    3. State's Rebuttal Case

¶ 51    Chicago police detective Edward Killeen testified that he was assigned to investigate the shooting of Anthony Strong on July 5, 2015. He interviewed defendant, whom he identified in court, at a police station at 5:38 p.m. that day. Killeen did not observe any injuries to defendant. He testified booking photographs accurately depicted how defendant appeared on July 5, 2015, and that defendant's "whole face looks red" in those photographs. Killeen acknowledged that one

"could interpret" defendant's booking photographs as showing "some swelling over his left eye." The State moved defendant's booking photographs into evidence.

¶ 52    Mike Pekara testified that he interviewed Aldridge while working as an Assistant State's Attorney on August 6, 2018. Aldridge stated that he had a verbal altercation with Anthony Strong on July 5, 2015, but never said that altercation became physical.

¶ 53    4. Closing Argument and Verdict

¶ 54    In closing, defendant conceded that he shot and killed Anthony Strong but argued that he did so in self-defense, and that the jury could find that his belief in the need for self-defense was either reasonable or unreasonable. The State contended that defendant intentionally shot Anthony solely out of anger and that defendant's version of events was not credible.

¶ 55    After being instructed on first-degree murder and second-degree murder based on an unreasonable belief in the need for self-defense, the jury found defendant guilty of first-degree murder and found that he personally discharged  firearm.

¶ 56    C. Posttrial and Sentencing

¶ 57    Defendant filed a motion for a new trial , which argued in relevant part that the trial court erred in admonishing the prospective jurors that they would be sent "to the Daley Center [to] get stuck on a one-month civil trial" if they indicated they could not be fair. Defendant's motion for a new trial did not mention the court's Rule 431(b) instructions and defendant did not raise that issue at the hearing on his motion. The court denied defendant's motion for a new trial and sentenced him to 45 years' imprisonment.

¶ 58    Defendant filed a motion to reconsider sentence, which the court denied.

¶ 59    Defendant timely appealed.

¶ 60    II. ANALYSIS

¶ 61    A. Rule 431(b) Questioning

¶ 62    On appeal, defendant first contends his conviction should be reversed and this case should be remanded for a new trial because the trial court did not comply with Rule 431(b) and *People v. Zehr*, 103 Ill. 2d 472 (1984), when it failed to ask the prospective jurors if they understood and accepted the four principles of criminal justice set forth in Rule 431(b).

¶ 63    Rule 431(b) requires the trial court to "ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Rule 431(b) imposes " 'an affirmative *sua sponte* duty on the trial court to ask potential jurors in each and every case whether they understand and accept' " these principles and requires the trial court to give each venireperson an opportunity to respond whether he or she understands and accepts these principles. *People v. Magallanes*, 409 Ill. App. 3d 720, 729-30 (2011) (quoting *People v. Graham*, 393 Ill. App. 3d 258, 273 (2009)). We review the trial court's compliance with Rule 431(b) *de novo*. *People v. Belknap*, 2014 IL 117094, ¶ 41.

¶ 64    Defendant acknowledges he failed to preserve this issue for review by not objecting during jury selection and failing to raise the issue in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Nevertheless, he contends we should engage in plain error review.

¶ 65    Under the plain error doctrine, a reviewing court may consider an unpreserved error when either (1) a clear or obvious error occurred and the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Birge*, 2021 IL 125644, ¶ 24 (not yet released for publication and subject to revision or withdrawal). The first step under either prong of the plain error doctrine is to determine whether an error occurred. *Id.*

¶ 66    1. Whether Error Occurred

¶ 67    Our supreme court has explained that a trial court's Rule 431(b) questioning must determine whether the prospective jurors both understand and accept the four principles outlined in the Rule. In *People v. Sebby*, 2017 IL 119445, the trial court asked the prospective jurors whether they "[h]ad any problems" with or "believe[d] in" the Rule 431(b) principles. (Internal quotation marks omitted). *Sebby*, 2017 IL 119445, ¶ 8. The supreme court found that this phrasing did not comply with Rule 431(b) and constituted clear error because the "rule requires the trial court to ask potential jurors whether they understand and accept the four *Zehr* principles." *Id.* ¶ 49. Similarly, in *Belknap*, the supreme court found that the trial court asking prospective jurors whether they "had any disagreement or quarrel with the principles" of Rule 431(b) was error. *Belknap*, 2014 IL 117094, ¶ 46. In *People v. Wilmington*, 2013 IL 112938, our supreme court explained that "[w]hile it may be arguable that the court's asking for disagreement, and getting none, is equivalent to juror *acceptance* of the principles, the trial court's failure to ask jurors if they *understood* the four Rule 431(b) principles is error in and of itself." (Emphasis in original.)

*Wilmington*, 2013 IL 112938, ¶ 32. In *People v. Thompson*, 238 Ill. 2d 598 (2010), the supreme court found that the trial court violated Rule 431(b) by asking "the prospective jurors if they understood the presumption of innocence," but not "whether they accepted that principle." *Thompson*, 238 Ill. 2d at 607.

¶ 68    The State concedes, and we agree, that the trial court's Rule 431(b) questioning constituted error. All but one of the court's Rule 431(b) questions asked whether the prospective jurors "disagree[d]" with the relevant principles of criminal justice, not whether they accepted and understood those principles. Under the Illinois Supreme Court authority outlined above, this phrasing was improper. Accordingly, we find the trial court's questioning of the prospective jurors did not comply with Rule 431(b) and constituted error.

¶ 69    2. First-Prong Plain Error

¶ 70    Having found error, we next consider whether reversal is warranted. Generally, under the plain error doctrine, reversal is warranted when there is a clear or obvious error and either (1) the evidence is so closely balanced that the error would change the outcome of the case, or (2) the error is so serious that it affected the fairness of the defendant's trial. *Birge*, 2021 IL 125644, ¶ 24. However, "[a] Rule 431(b) violation is not cognizable under the second prong of the plain error doctrine, absent evidence that the violation produced a biased jury." *Sebby*, 2017 IL 119445, ¶ 52; see also *Birge*, 2021 IL 125644, ¶ 24 ("[A] violation of Rule 431(b) is not a second-prong, structural error"); *Wilmington*, 2013 IL 112938, ¶ 33 ("[T]he second prong of plain-error review does not provide a basis for excusing defendant's procedural default" of a Rule 431(b) violation.). Defendant contends first-prong plain error occurred because the evidence was closely balanced

where the jury could have found unreasonable self-defense, which would have resulted in the jury finding him guilty of second-degree murder instead of first-degree murder.

¶ 71    When a defendant claims first-prong plain error, we must decide whether the evidence was so closely balanced the error alone severely threatened to tip the scales of justice. *Sebby*, 2017 IL 119445, ¶ 51. We do not presume prejudice; rather, the defendant "must show that the quantum of evidence presented by the State against the defendant rendered the evidence 'closely balanced.' " *People v. Piatkowski*, 225 Ill. 2d 551, 566 (2007) (quoting *People v. Herron*, 215 Ill. 2d 167, 193 (2005)). In determining whether the evidence was closely balanced, we evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it. *Belknap*, 2014 IL 117094, ¶¶ 52-53. Thus, we assess "the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Sebby*, 2017 IL 119445, ¶ 53.

¶ 72    Defendant was charged with first-degree murder under section 9-1(a)(1) of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(1) (West 2014)). Thus, the State had to prove he intentionally killed Anthony Strong without lawful justification. See 720 ILCS 5/9-1(a)(1) (West 2014).

¶ 73    Defendant did not deny he shot and killed Anthony Strong; rather, he advanced a theory of self-defense. To establish complete self-defense, a defendant must show: (1) force was threatened against a person; (2) the person was not the aggressor; (3) the danger of harm to the person was imminent; (4) the threatened force was unlawful; (5) the person actually and subjectively believed a danger existed, which required the use of the force applied; and (6) his beliefs were objectively reasonable. *People v. Washington*, 2012 IL 110283, ¶ 35. Relevant here, to be found guilty of second-degree murder premised on an unreasonable belief in the need for self-defense, a defendant must only prove the existence of the first five factors. *People v. Castellano*, 2015 IL App (1st)

133874, ¶ 149. The question before us, therefore, is whether the evidence was closely balanced on the issue of whether defendant had an unreasonable belief in the need for self-defense.

¶ 74    We find that the evidence was closely balanced on this point. Defendant claimed that he shot Anthony because, after Anthony beat him about the body and head for no reason, defendant saw Anthony go to his truck, appear to retrieve an object, and walk toward him with it. Defendant did not know what was in Anthony's hand, but he believed it was a firearm because he had seen Anthony with a firearm on multiple prior occasions and knew Anthony had shot and killed someone in the past. Defendant was the only witness who testified to these facts. Yolanda and Antoine did not testify Anthony went to his truck; rather, defendant shot him from a distance when Anthony was at the rear of defendant's Cadillac. Yolanda and Antoine agreed Anthony was unarmed when defendant shot him, and police recovered no weapons from or near Anthony's body. Thus, defendant's testimony supporting his claim of self-defense was uncorroborated by direct evidence.

¶ 75    However, the physical evidence corroborated other aspects of defendant's account. For example, Dr. Arunkumar testified that Anthony's blood alcohol level was at least 0.352 prior to his death, more than four times the legal limit to drive in Illinois. This evidence indicated Anthony was highly intoxicated on July 5, 2015, and corroborated defendant's claim that Anthony was behaving "crazy" and violently. The alcohol evidence also undermined Yolanda's claim that Anthony was sober when he arrived on South Harper and only drank one beer thereafter. A photograph introduced by defendant confirmed that Anthony's truck was parked across the street from defendant's car, supporting an inference that Anthony could have retrieved an object from his truck and quickly approached defendant, as defendant claimed. In addition, Detective Killeen

acknowledged that one "could interpret" defendant's booking photograph as depicting swelling above his left eye, supporting defendant's testimony that Anthony struck him in the head.

¶ 76    Moreover, eyewitness testimony supported defendant's claim that Anthony instigated violence on July 5, 2015. For example, Antoine testified that Anthony pushed defendant to the ground in defendant's front yard. Similarly, Aldridge corroborated defendant's testimony that Anthony was behaving aggressively. No witness disputed defendant's testimony that he had seen Anthony with a firearm on multiple prior occasions, or that he knew Anthony had murdered someone in the past. Thus, both physical and eyewitness evidence supported defendant's testimony that Anthony was highly intoxicated and instigated violence in the moments leading up to the shooting. Altogether, the evidence presented a muddled picture of what occurred on July 5, 2015. Both sides presented accounts that were plausible and corroborated in some respects, yet implausible and uncorroborated in others.

¶ 77    This case is similar to *People v. Cook*, 262 Ill. App. 3d 1005 (1994). In *Cook*, the defendant was charged with first-degree murder and asserted self-defense, claiming the victim, his girlfriend, attacked him with a knife. *Cook*, 262 Ill. App. 3d at 1006, 1014. The jury found defendant guilty of second-degree murder. *Id.* at 1015. On appeal, we found that the trial court's failure to instruct the jury that the State had the burden to prove the defendant was not justified in using force constituted plain error where the evidence was closely balanced. *Id.* at 1019. Specifically, we found that the evidence was closely balanced because "[t]ests showed that the deceased's blood contained a high level of alcohol. These results enhance[d] the likelihood that the deceased was the initial aggressor in the physical altercation." *Id.* at 1016. Moreover, the defendant knew the victim had killed a man before and the parties stipulated she had been convicted of manslaughter. *Id.* The

defendant had also seen the victim brandishing a knife on a prior occasion. *Id.* On the other hand, the medical and photographic evidence suggested the struggle between the defendant and the victim was one-sided, which "support[ed] the State's theory that defendant did not act in self-defense." *Id.* All the factors that led us to conclude the evidence was closely balanced in *Cook* are present in this case, so we reach the same conclusion. The evidence in this case was closely balanced on the issue of unreasonable self-defense.

¶ 78    The State argues the evidence was not closely balanced because defendant's version of events was implausible and "bizarre." However, as noted above, certain aspects of defendant's account were corroborated by extrinsic physical evidence. In addition, a reasonable jury could have found the State's theory to be implausible. The State asked the jury to believe that defendant killed his close friend of some 25 years, with whom he had never been seriously violent, out of anger over Anthony touching his car.

¶ 79    The State also points to discrepancies in defendant's testimony to argue that the evidence was not closely balanced. For example, the State contends that defendant testified the shooting occurred in the morning, whereas Detective Neighbors testified she was notified of the shooting in the afternoon. The State also notes that defendant testified his firearm was loaded with one bullet when Officer Paschal's testimony implied it was loaded with two. However, "[m]inor inconsistencies" in a defendant's testimony do not make his account of events "fanciful." See *Sebby*, 2017 IL 119445, ¶ 61. The time of the shooting was immaterial to defendant's belief in the need for self-defense and there was no dispute he shot Anthony with one bullet.

¶ 80    The cases the State cites have little bearing on whether the evidence was closely balanced in this case because none of them involve murder or claims of self-defense. See, e.g., *Jackson*,

2019 IL App (1st) 161745 (defendant charged with possession of heroin with intent to deliver); *People v. Montgomery*, 2018 IL App (2d) 160541 (defendant charged with DUI); *People v. Lopez*, 2012 IL App (1st) 101395 (defendant charged with criminal sexual abuse and unlawful restraint). Accordingly, we find the evidence was closely balanced and the trial court's failure to comply with Rule 431(b) constituted plain error; thus, we reverse defendant's conviction and remand for a new trial.

¶ 81    B. Comments Regarding Prospective Jurors

¶ 82    Because we reverse defendant's conviction due to the trial court's failure to comply with Rule 431(b), we need not address defendant's contention that the court's comment about prospective jurors' ability to be fair was reversible error or defendant's claim of ineffective assistance of trial counsel.

¶ 83    III. CONCLUSION

¶ 84    For the foregoing reasons, we reverse the judgment of the circuit court of Cook County and remand for further proceedings.

¶ 85    Reversed and remanded.